ERIC L. CHRISTENSEN
JONATHAN D. TEBBS
CAIRNCROSS & HEMPELMANN PS
524 SECOND AVENUE, SUITE 500
SEATTLE, WA  98104
T: 206.587.0700

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BLOCKTREE PROPERTIES, LLC, a Washington limited liability company, CORSAIR INVESTMENTS WA, LLC, a Washington limited liability company, CYTLINE, LLC, a Delaware limited liability company, 509 MINE, LLC, a Washington limited liability company, MIM INVESTORS, LLC, a Washington limited liability company, MINERS UNITED, LLC, a Washington limited liability company, TELCO 214 WHOLESALE SOFTWARE, INC., a Washington corporation, MARK VARGAS, an individual, and, WEHASH TECHNOLOGY, LLP, a Washington limited liability company,<br><br>                   Plaintiffs,<br><br>      v.<br><br>PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, WASHINGTON, a Washington municipal corporation, TERRY | NO.<br><br>COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES |

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 1

BREWER, individually and in his
official capacity, BOB BERND,
individually and in his official capacity,
DALE WALKER, individually and in
his official capacity, TOM FLINT,
individually and in his official capacity,
LARRY SCHAAPMAN, individually
and in his official capacity, and DOES 1-
10, managers and employees of Grant
PUD, individually and in their official
capacities,

Defendants.

Plaintiffs (collectively, "Plaintiffs") hereby seek injunctive relief, a declaratory judgment, and damages against Defendant Public Utility District No. 2 of Grant County, Washington ("Grant" or "the PUD") to: (1) enjoin the implementation of Grant's recently-adopted Rate Schedule 17, which illegally discriminates against Plaintiffs and threatens Plaintiffs with crippling electric rate increases, on the order of 300% or more, that would destroy Plaintiffs' businesses; and, (2) award damages to Plaintiffs arising from the adoption of Rate Schedule 17.

## I.    NATURE OF THE ACTION

1.1    This action seeks preliminary and permanent injunctive relief, a declaratory judgment, and damages against Defendant under the Commerce Clause of the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, 42 U.S.C. §§ 1983 & 1988, the Federal Power Act, RCW Title 54,

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 2

and the Constitution of the State of Washington.  Plaintiffs seek to bar Defendant from adopting Rate Schedule 17 and to collect damages for Defendant's unconstitutional conduct.  Schedule 17 violates the Commerce Clause of the United States Constitution because it discriminates against Plaintiffs and in favor of local economic interests, and it also places a huge burden on interstate commerce that is unjustified by any legitimate local interest.  Schedule 17 violates the Due Process Clauses of both the U.S. and Washington Constitutions because it makes Grant PUD staff the judge, jury, and executioner, allowing staff to force Plaintiffs (and any other industry) into Schedule 17, with its crippling rate increases, without even minimal procedural protections such as the opportunity to be heard and the opportunity to appeal.  Indeed, Grant PUD's conduct since the adoption of Rate Schedule 17 demonstrates that Plaintiffs have been classified as "Evolving Industries" subject to Rate Schedule 17 by fiat of Grant staff, without even going through the minimal procedures Rate Schedule 17 supposedly requires.  Because Grant and its Commissioners are acting under the color of state law and committing a violation of Plaintiffs' rights under the U.S. Constitution, Grant and its Commissioners are liable for damages under 42 U.S.C. § 1983, and for Plaintiffs' costs and attorneys' fees under 42 U.S.C. § 1988.

1.2    Because Grant PUD holds a hydropower license issued by the Federal Energy Regulatory Commission, Grant PUD is bound by Section 20 of the Federal Power Act, 16 U.S.C. § 813, which requires Grant PUD to adopt rates that are just, reasonable, and non-discriminatory and prohibits Grant from adopting rates that do not meet these requirements.  Because Rate Schedule 17 violates this statute, Plaintiffs are entitled to declaratory and injunctive relief barring Grant PUD from implementing Rate Schedule 17.

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

1.3    Further, Grant's Board of Commissioners is required by its organic statutes to adopt and maintain rates that are fair, non-discriminatory, and that collect no more than Grant's reasonable costs to provide service.  Rate Schedule 17 fails each of these tests.  It also improperly delegates to Grant staff the rate-setting function the statute requires to be performed by Grant's elected Commissioners.  And Rate Schedule 17 violates Grant PUD's own internal policies, and is therefore illegally arbitrary and capricious.

1.4    Schedule 17 is blatantly unfair and discriminatory as it singles out Plaintiffs for extreme and crippling rate increases solely because they use block-chain technology to "mine" cryptocurrency.  Plaintiffs in fact provide security services to digital currencies and can provide similar services for a variety of block-chain applications, and also have the ability to provide a variety of other data center services, including artificial intelligence, traditional data center solutions, virtual reality, and GPU rendering, among others.  Should other applications prove more profitable, Plaintiffs have the ability to convert their operations from block-chain and cryptocurrency security operations and to one or more of these other data center services.  In this respect, Plaintiffs are indistinguishable from many other Grant customers operating data centers that provide services other than cryptocurrency security and verification, and who have the same impacts on Grant's cost of service yet are exempt from the rate increase.  Schedule 17 violates Article 1, Section 12 of the Washington Constitution because there is no legitimate basis for treating Plaintiffs differently from other similarly-situation Grant PUD customers.

## II.    PARTIES

2.1    Plaintiff Blocktree Properties, LLC ("Blocktree") is a Washington Limited Liability Company and is a subsidiary of Blocktree, Inc., a Delaware

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 4

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

corporation. Blocktree is headquartered in Tempe, Arizona, and has facilities located in Moses Lake, Washington, and Phoenix, Arizona.

2.2    Plaintiff  Corsair Investments WA, LLC ("Corsair") is a Washington Limited Liability Company with offices in Englewood, Colorado, Quincy, Washington, and Spokane, Washington, and operations in Grant County, Washington.  Corsair Investments WA, LLC, is a wholly-owned subsidiary of Corsair Investments, LLC, a Colorado Limited Liability Company with operations in Colorado.

2.3    Plaintiff  Cytline, LLC ("Cytline") is a Delaware Limited Liability Company with offices in Boise, Idaho, and operations in Grant County, Washington.

2.4    Plaintiff 509 Mine, LLC ("509 Mine") is a Washington Limited Liability Company with offices located in Bellevue and Cashmere, Washington, with additional facilities located in Moses Lake, Washington.

2.5    Plaintiff MIM Investors, LLC ("MIM") is a Washington Limited Liability Company with principal offices in Boise, Idaho, and with facilities located in Moses Lake, Washington.  MIM Investors is owned jointly by Cytline and 509 Mine.

2.6    Plaintiff Miners United, LLC ("Miners United") is a Washington Limited Liability Company with offices in Cashmere, Washington, and operations in Grant County, Washington.  Miners United leases data center facilities from MIM in Grant County and must pay for all costs for electric power incurred at the Grant County facility.

2.7    Plaintiff Telco 214 Wholesale Software, Inc. ("Telco 214"), is a Washington Corporation with offices in Ephrata, Washington, and  operations in Grant County, Washington.  Telco 214 is the owner of municipal bonds issued by

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

Grant PUD.  Telco 214 previously operated in Grant County under the names Telco 214 US, Inc. and Telco 214 Leasing, Inc.

2.8    Plaintiff Mark Vargas ("Vargas") is an individual citizen of the State of California who operates facilities in Grant County, Washington, in his own name.  Vargas is a principal of Mission Valley Mining, LLC, a California Limited Liability Company which operates similar facilities in California and Tennessee.

2.9    Plaintiff WeHash Technology, LLP ("WeHash") is a Washington Limited Liability Partnership with offices in Moses Lake, Washington, and operations in Grant County, Washington, as well as Vancouver, British Columbia, Canada.

2.10   Defendant Public Utility District No. 2 of Grant County, Washington, is a municipal corporation and public utility district operating under Title 54 of the Revised Code of Washington, with headquarters in Ephrata, Washington, and facilities located in Grant and adjacent counties.

2.11   Defendant Terry Brewer was President of the elected Commission of Grant PUD at the time Schedule 17 was adopted.  Brewer is named in both his individual and official capacities.

2.12   Defendant Bob Bernd was Vice President of the elected Commission of Grant PUD at the time Schedule 17 was adopted.  Bernd is named in both his individual and official capacities.

2.13   Defendant Dale Walker was Secretary of the elected Commission of Grant PUD at the time Schedule 17 was adopted.  Walker is named in both his individual and official capacities.

2.14   Defendant Tom Flint was an elected Commissioner of Grant PUD at the time Schedule 17 was adopted.  Flint is named in both his individual and official capacities.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 6

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

2.15   Defendant Larry Schaapman was an elected Commissioner of Grant PUD at the time Schedule 17 was adopted.   Schaapman is named in both his individual and official capacities.

2.16   Does 1-10 are managers and employees of Grant PUD who participated in the deprivation of Plaintiffs' constitutional rights.   Does 1-10 are named in both their individual and official capacities.

### III.   JURISDICTION AND VENUE

3.1   This court has jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 16 U.S.C. § 813.

3.2   Venue is proper in this Court under 28 U.S.C. § 1391.

### IV.   FACTS

**A.   Block-Chain Technology and Cryptocurrency Mining.**

4.1   Block-chain technology, which was introduced   approximately ten years ago, holds vast promise to bring new efficiencies, greater transparency, and improved security to industries as varied as finance, commodities trading, and renewable energy.   Block-chain's key feature is a "distributed ledger," which records each step in a transactional chain and which is independently verified by multiple independent computer operators, providing an immutable record that ensures the data can never be manipulated.

4.2    The distributed ledger feature of block-chain allows the secure exchange of information or value between unrelated parties, with each step in the chain of exchanges between unrelated parties independently verified by operation of the distributed ledger.   The distributed ledger permits the exchange of value without the necessity of a government, bank, or other central institution acting as a transactional intermediary.   Similarly, blockchain allows the secure and verifiable exchange of information between unrelated parties.   This opens the possibility of

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 7

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

unprecedented freedom in economic exchange and in the exchange of information, and a massive reduction in the costs imposed on transactions by banks and other third-party intermediaries.   Plaintiffs play a critical role in the functioning of the blockchain by providing verification and securitization of the distributed ledger  -- that is, the auditing function of block-chain.

4.3   A number of different cryptocurrencies have emerged in recent years that employ blockchain technology to exchange value without the necessity of intermediaries such as central governments or banks.   For example, BitCoin transactions are recorded in encrypted form until a 1-megabyte ("MB") "block" of transactions is created.   The "block" is then unencrypted and added to the transaction "chain" in a publicly-available, immutable, and verifiable form. Plaintiffs and their competitors around the world perform the critical function of decrypting, verifying, and adding these "blocks" to the transactional "chain." Plaintiffs thus ensure that the exchange of value that occurs when a cryptocurrency token is exchanged is accurate, that there is no double-spending of cryptocurrency tokens, and that the transactions are secure.   Because multiple parties participate in the verification and securitization of the blockchain, blockchain is far more secure than traditional forms of electronic exchange, which can be "hacked" by penetrating a single bank or other intermediary, which represents a single point of failure, whereas multiple points of security on the blockchain make hacking nearly impossible.

4.4   In return for performing this verification and securitization function, Plaintiffs are compensated.   For most cryptocurrencies, Plaintiffs receive cryptocurrency tokens when they securely verify a block, and are often referred to as cryptocurrency "miners" although traditional mining of resources from the earth is similar to the function of cryptocurrency miners only in a metaphorical sense, if

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

at all.   But payment in cryptocurrency is certainly not essential and for many private block-chains, companies performing verification/securitization are paid in ordinary fiat currency.

4.5    Decryption of cryptocurrency blocks requires powerful computer systems which, in turn, require a considerable amount of electric power to operate. Because power costs are a major element in Plaintiffs' costs of doing business, Plaintiffs were attracted to Grant County because of its relatively low costs of power.

**B.    Plaintiffs Relied on Grant PUD's Assurances of Low and Stable Electric Rates.**

4.6    In making the choice to locate in Grant County rather than in other locations in the United States or abroad, Plaintiffs relied on promises from Grant PUD that their power costs would remain low and stable, and that increases in power rates would be incremental and gradual.  For example, before locating in Grant County in the summer of 2014, Plaintiff Cytline met several times with Grant PUD staff, which "rolled out the red carpet," assuring Cytline that Grant PUD was dedicated to developing the County's economy by attracting data centers and other high-tech industries.  Grant PUD staff assured Cytline that its power rates would remain low and stable, that increases in rates would come about only if Grant's costs of service increased, and that Grant had tremendous amounts of power available that could accommodate Cytline's growth.   Cytline inquired whether Grant PUD would be willing to enter a contract and was assured that a contract was unnecessary because rates would remain low and stable.  In fact, Grant PUD Staff worked closely with Cytline to identify and discuss potential expansion locations. Numerous sites were vetted with the staff and potential

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 9

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

upgrades to existing plants were discussed that would parallel the upgrades implemented at Cytline's original site.  Cytline ultimately located in an area of Grant County with excess capacity that was easily adequate to handle both the power demands and transmission needs of Cytline's facilities.

4.7    Cytline relied on these representations in electing to locate in Grant County and has made very large investments in the County.  Although Cytline's 2 MW facility in Moses Lake is small by industry standards, since 2014, Cytline has spent $6,647,124 on property, plant, equipment, and general/administrative expenses.  Of that amount, $350,000 was paid to local labor, $710,000 was paid to the PUD, $515,000 has been paid in use tax (which directly benefits the county), and $250,000 was paid to local landlords.  Cytline affiliate MIM recently opened a second facility with a capacity of 2.5 MW, and had taken steps to add another 2.5 MW facility until the adoption of Rate Schedule 17 rendered expansion plans uneconomic.  To date, MIM has spent more than $800,000 on the new facility.  MIM was also planning to seek a building permit for a new 4,000 square foot building that will require local labor, local equipment, and materials.  MIM was planning to spend at least $500,000 to complete the building.  Rate Schedule 17 threatens to destroy Cytline's and MIM's investments in Grant County, as well as the investments made by its affiliates and by its customer Miners United.

4.8    Other Plaintiffs relied on similar representations from Grant PUD and made similarly sizable investments in Grant County.  Blocktree has operated in Grant County since 2014, first as a tenant of a data center located in Moses Lake, Washington, and then with facilities of its own.  Blocktree relied on Grant PUD's representations that it would pay rates under Rate Schedule 7 and that any increases in rates would be foreseeable, gradual, and manageable, when it elected

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 10

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

to construct its own facility in Grant County. Blocktree has invested more than $400,000 in that facility, which went into operation in April 2017.

4.9    Corsair contacted Grant PUD staff and received assurances that 5 MW of service were available at Corsair's preferred site and that Corsair would receive power under Grant's Rate Schedule 7. Corsair relied on these representations in electing to locate in Grant County and has now invested approximately $1.8 million in facilities in the County, and even moved two employees to Grant County based on assurances that Corsair could continue to operate facilities there.

4.10    Relying on similar direct representations from Grant PUD staff, as well as representations transmitted indirectly through Cytline and MIM, Miners United elected to locate in Grant County and has now invested $812,379.50 in facilities in the County.

4.11    Telco 214 worked closely with Grant PUD staff to determine the rates Telco 214 would pay and the costs of upgrades needed to Grant's system to serve Telco 214's load. Telco 214 relied on Grant PUD's representations that its rates would remain low and stable, and would be raised only in small and predictable increments, in electing to locate in Grant County. Telco 214 has now invested approximately $20 million in Grant County for property, plant, equipment, and general/administrative expenses in reliance on these representations. Of that amount, $1,300,000 was paid to local labor, $4,100,000 was paid to the PUD, $1,000,000 has been paid in use tax (which directly benefits the county), and $350,000 was paid to local landlords.

4.12    Vargas researched Grant County power rates and spoke to Grant PUD staff prior to signing a long-term lease for a facility located in Moses Lake. Grant PUD staff assured Vargas that he could secure 1 MW of capacity at the Moses Lake location (eventually reduced to 750 kw). Vargas told Grant staff when

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 11

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

meeting with them in person at the Moses Lake site that he wanted to locate in Grant County "for the abundant reliable and renewable energy." Grant PUD staff assured Vargas that he would be served under Rate Schedule 7, that Schedule 7 rates would remain low and stable, and that those rates would be raised only in small and predictable increments. Vargas relied on these representations in electing to locate in Grant County and has now invested over $350,000 in facilities and equipment in the County. He has hired local contractors and spent well over $100,000 with local businesses during the build out of his Moses Lake facility. In addition, he contributes to the local volunteer fire department with generous donations. Vargas has also had a 5 MW power request on file with Grant County since November of 2017 for a facility located at 999 Road M. Vargas has communicated with Grant PUD staff about electric service to the 999 Road M facility and staff stated as recently as July 2018 that Grant PUD would grandfather existing block-chain service providers, including the 999 Road M facility, into Rate Schedule 7 because this would be the only fair way to treat existing Grant customers.

4.13 WeHash had extensive contacts with Grant staff, who assured WeHash that plentiful, inexpensive power was available and that any future rate increases would be incremental and gradual. WeHash relied on these representations in electing to locate in Grant County and has now invested approximately $5 million in facilities in the County.

**C.    Fear and Loathing of Cryptocurrency Service Providers Produces Grant PUD's Overreaction in the Form of Rate Schedule 17.**

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 12

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

4.14   Collectively, Plaintiffs' facilities operate with an electrical capacity of 12.25 megawatts ("MW")[1] and place an average load of approximately 11 MW on Grant, consuming approximately 8,000 MWh of electricity per month.   By comparison, Grant sold more than 4.6 million MWh of electricity in 2017, and its load averaged 535 MW.   The generating capacity available from Grant's existing portfolio of resources exceeds 2,200 MW and Grant's most recent Integrated Resource Plan forecasts that Grant will have sufficient resources to meet expected load growth through at least 2024.

4.15   After Plaintiffs established operations in Grant County, additional cryptocurrency operations and other energy-intensive industries expressed interest in obtaining power from Grant.   According to Grant's public claims, it has received requests for service totaling approximately 2,000 MW, including approximately 1,500 MW from cryptocurrency operations.   These claims arise from applications for service or other indications of interest, but not from any actual obligation to serve these loads, which remain potential customers only. On information and belief, the current queue of potential new cryptocurrency operations is only a tiny fraction of the 1,500 MW claimed by Grant PUD.   In fact, in a recent Official Statement for issuance of municipal bonds, Grant PUD stated that many requests for service "do not materialize for a variety of reasons" and that its "load forecasts are based on signed agreements," not mere expressions of interest, yet the 1,500 MW forecast is based almost entirely on mere expressions of interest and not signed agreements.

---

[1] Bulk electric capacity is generally measured in MW – one MW equals one thousand kilowatts ("kW").   Electric consumption is generally measured in megawatt-hours ("MWh") or kilowatt-hours ("kWh").   A device consuming one thousand watts of power for one hour consumes one kWh.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 13

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

4.16 Schedule 17 is Grant's response to this assumed influx of cryptocurrency miners.   Although Rate Schedule 17 ostensibly applies to any "evolving industry," the evidence makes plain that Rate Schedule 17 is intended to apply only to cryptocurrency service providers, and that Grant is acting with malice toward this new industry, assigning unjustified blame to Plaintiffs, and aiming to cripple cryptocurrency service providers in order to benefit parochial interests in Grant County.

**D.    Rate Schedule 17 Unjustifiably Ascribes Unusual Risks to Cryptocurrency Service Providers.**

4.17 Plaintiffs have not caused any of the problems supposedly arising from the influx of new cryptocurrency operations in Grant County.   On the contrary, as Commissioner Bob Bernd admitted in an open session of the Grant PUD Board of Commissioners: "None of the [cryptocurrency operations] who are already here are causing harm to our system."

4.18 Schedule 17 is designed on its face to protect Grant from "future risk" to Grant's "revenue stream."   But Plaintiffs do not present such a risk.   On the contrary, each Plaintiff  has an established track record of paying its Grant PUD bills on time and in full.   Further, each Plaintiff made a significant cash security deposit with Grant.   Hence, even if one of the Plaintiffs were to default on payments owed for an electric bill, Grant would be fully protected from non-payment because it could draw on that Plaintiff's deposit to pay the overdue amount in full and terminate service before that Plaintiff could begin to accumulate a bill that would not be covered by the cash deposit.   In fact, Grant PUD staff's presentation to the PUD's Board of Commissioners at its June 26, 2018, meeting recognizes that an "individual Evolving Industry customer" could "provide upfront

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 14

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

risk mitigation that would alleviate the need for part or all of the ongoing risk premium" that accounts for essentially all of the massive rate increase imposed in Rate Schedule 17.

4.19   Specifically, Blocktree began taking service directly from Grant PUD in April 2017 (and was an indirect customer of Grant for three years prior to that, when it leased space in a Grant County data center), and has paid each of its Grant PUD electricity bills on time and in full.  In addition, Blocktree has a security deposit of more than $20,000 with Grant, sufficient to cover well in excess of two months of its average bill should Blocktree fail to pay.  In addition, Blocktree has a four-year history of paying its electricity bills on time and in full with Salt River Project, which provides electric service to Blocktree's cryptocurrency facility located in Arizona.

4.20    Corsair began taking service from Grant PUD in October 2017 and its predecessor Hashplex, LLC, began taking service from Grant PUD in October 2013.  Corsair has paid each of its Grant PUD electricity bills on time and in full, with the exception of a few bills that were paid late due to administrative errors occurring in the transition from Hashplex.  In addition, Corsair has a security deposit of approximately $33,000 with Grant, sufficient to cover about two months of its average bill should Corsair fail to pay.

4.21   Cytline began taking service from Grant PUD in the middle of 2015 and has paid each of its Grant PUD electricity bills on time and in full, and also paid a substantial amount to Grant PUD for the transformers that were placed on Cytline's site.  In addition, Cytline (through its corporate predecessor Yochum Analytics) has a nine-year history of paying its bills on time and in full with utilities outside Grant County.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 15

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

4.22   MIM began taking service from Grant PUD in January 2018.  It has paid each of its Grant PUD electricity bills on time and in full.  In addition, Cytline and MIM have a letter of credit with a major financial institution on file with Grant PUD, which assures Grant PUD of payment of $50,000 for both Cytline and MIM should either company default.  This amount is sufficient to cover approximately two months' average electric bill for each Plaintiff's facility in Grant County. MIM also paid Grant PUD substantial amounts for the transformers that were placed on its site.

4.23   Telco 214 began taking service from Grant PUD in May 2014, and has paid each of its Grant PUD electricity bills on time and in full, usually within 48 hours of posting.  In addition, Telco 214 has a security deposit of $49,700 with Grant, sufficient to cover 2-3 weeks of its average bill should Telco 214 fail to pay.

4.24   Vargas began taking service from Grant PUD on August 16, 2017 and has paid each of his Grant PUD electricity bills on time and in full.  In addition, Vargas has a security deposit of $8000 with Grant County PUD for his facility located at 999 Road M, Moses Lake and $6,500 for his facility located at 706 Penn St., Moses Lake, sufficient to cover approximately 2 months of its average bill should Vargas fail to pay.  In addition, Vargas has an 18-month history of paying his utility bill on time and in full with Silicon Valley Power in Santa Clara, California.

4.25   WeHash began taking service from Grant PUD in October 2014 and has paid each of its Grant PUD electricity bills on time and in full.  In addition, WeHash has a security deposit of $30,000 with Grant, sufficient to cover approximately two months of its average bill should WeHash fail to pay.

4.26   Despite admitting that Plaintiffs are not the cause of its problems, Grant PUD has adopted Schedule 17 in a form that categorically sweeps

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 16

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

cryptocurrency operations into its fold, with devastating consequences for Plaintiffs, but without any basis in the cost of serving Plaintiffs, the risk that Plaintiffs present to the Grant system and its ratepayers, or the similar risks that many other energy-intensive industries served by Grant present to its system.

4.27  As Grant PUD Commissioner Larry Shaapman recognized (as paraphrased by a Grant PUD press release), "cryptocurrency mining operations that have been operating in the county several years don't present the same risks as the new, incoming cryptos who wouldn't have proven an ability to pay rates longer-term."

4.28  Although Plaintiffs repeatedly urged Grant PUD's Commission to protect them by "grandfathering" them into their existing rates, and offered to work with both Grant staff and its Commissioners to minimize the risks perceived by Grant, they were consistently rebuffed and ignored.  Grant PUD refused to do so on the ground that grandfathering is "legally untenable."  This was plain legal error, as demonstrated by the fact that Grant PUD's existing rates already contain grandfathering provisions.  In fact, grandfathering was rejected at the behest of local parochial interests who wished to destroy cryptocurrency operations in Grant County in order to benefit their own interests.

4.29  Rate Schedule 17 ostensibly applies to any "evolving industry," but this is window dressing.  In the entire public process leading up to the adoption of Rate Schedule 17, there was never any suggestion that any industry other than cryptocurrency services would be classified as an "evolving industry" and exposed to Schedule 17's devastating rate increases, despite clear evidence from Grant's own planning documents that other industrial customers present risks to Grant that are as great or greater than the risks created by Plaintiffs.  Indeed, Staff comments on the draft white paper supporting Rate Schedule 17 emphasized that "regulation

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 17

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

criteria should keep cannabis out of the category.  As I've said before: keep the focus on cryptocurrency miners.  Don't give the newspaper a cheap headline!"

4.30  The "evolving industry" tests Grant PUD will supposedly apply under Rate Schedule 17 are a sham.  This is demonstrated by the fact that the only industry ever considered to be an "evolving industry" during the discussion and adoption of Rate Schedule 17 is the cryptocurrency industry.  Further, within hours of the adoption of Rate Schedule 17 by Grant PUD's elected Board of Commissioners, Grant PUD staff was informing potential customers in the cryptocurrency field that they would be classified as "evolving industry" customers subject to Rate Schedule 17 and that no other industries would be considered as possible "evolving industries," despite the fact that none of the analysis supposedly required by Rate Schedule 17 had been done on cryptocurrency or any other industry that could reasonably be classified as "evolving," and even though nearly any industry could fit within the parameters described in Rate Schedule 17.

4.31  The primary drivers for placing Plaintiffs are arbitrary and unrelated to any cost of service function.  Instead, Schedule 17 is ostensibly imposed on "evolving or unproven" industries that are adjudged unilaterally by Grant staff to present a risk that they would cease taking service from Grant PUD and thereby create a "future risk to Grant's revenue stream."  Specifically, Grant will unilaterally place entire industries in Rate Schedule 17 based on three risk factors, none of which has ever been used in formulating utility rates either by Grant PUD or by any other utility: (1) "Regulatory Risk," defined as the "[r]isk of detrimental changes to regulation with the potential to render the industry inviable within a foreseeable time horizon"; (2) "Business Risk," defined as the "[p]otential for cessation or significant reduction in service due to a concentration of business risk, in an evolving or unproven industry, in the value of the customer's primary

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

output"; and, (3) "Concentration Risk," defined as the "[p]otential for significant load concentration within Grant PUD's service territory resulting in a meaningful aggregate impact and corresponding future risk to Grant's revenue stream." Schedule 17 states that it may be applied if an industry presents "Concentration Risk" and at least one of the two other identified risks.   With respect to "Concentration Risk," Schedule 17 provides that "[e]valuation would begin to occur when industry concentration of existing and service request queue customer loads exceeds 5% of Grant PUD's total load," but none of the other critical threshold terms in Schedule 17 – "foreseeable time horizon," "potential for cessation," "significant reduction," "evolving or unproven industry," etc. – are even defined, let alone quantified.

4.32   Even cursory review reveals that the criteria Grant puts forth for classifying an industry as "evolving" fail to provide any reasonable basis for distinguishing cryptocurrency service providers from the many other energy-intensive industries served by Grant PUD and, in fact, Grant PUD's own documents demonstrate that these other industries create risks for Grant that are as serious as, or worse, than the supposed risks represented by cryptocurrency security service providers.   For example, Grant PUD's most recent Integrated Resource Plan states that more than one-third of its load "is attributable to its industrial customers" and "District customers such as data centers, chemical producers, and agricultural processors are particularly sensitive to rates" that can "attract significant load growth over a very short period of time," making "this customer class the highest load risk we face."  Notably, none of the Plaintiffs are in Grant PUD's industrial rate class.

4.33   The assumption that the cryptocurrency industry faces major "regulatory risk," defined as the risk that changes in regulation will "render the

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 19

industry inviable within a foreseeable time horizon," is simply incorrect. Despite its relatively recent emergence as a major economic force, regulators in the United States and elsewhere around the world are actively adapting regulatory structures to the cryptocurrency industry. In fact, the Managing Director of the International Monetary Fund recently suggested that the world's central banks should consider issuing digital currency, noting that digital currency may be a low-cost, secure, and efficient alternative to paper currency, and Sweden's central bank has announced its intention to adopt an official cryptocurrency. Similarly, the U.S. Department of Treasury has issued an opinion letter concluding that cryptocurrency is not subject to the Bank Secrecy Act because cryptocurrency security services providers are not "money services businesses" subject to Treasury regulations for banks and wire transfer services. The federal Financial Crimes Enforcement Network ("FinCen") is carefully monitoring cryptocurrency transactions to root out money laundering and other financial crimes. Similarly, the U.S. Securities and Exchange Commission and the U.S. Commodities Futures Trading Commission have issued a series of guidance documents intended to allow industries employing block-chain technology or cryptocurrency to comply with federal securities and commodities trading laws. Other countries, including major economic powers like Japan and South Korea, have instituted full regulatory frameworks for cryptocurrency. Such regulation does not threaten the viability of the industry, but instead indicates that regulators intend to ensure that blockchain and cryptocurrency companies comply with the relevant laws, and that the aim of regulators is to regularize compliance and adapt the regulatory regime to fit the new technology, not to render the industry "inviable." Many states have or are moving to regulate cryptocurrencies to protect consumers and prohibit money laundering, but none proposed to ban them outright and many are actively encouraging cryptocurrencies. For example,

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 20

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

the State of Ohio now accepts cryptocurrencies for tax payments. Hence, the regulatory risk faced by the cryptocurrency industry creates no more threat to its long-term viability than the regulatory risks faced by any other industry.

4.34  Suggestions that block-chain and cryptocurrency face immediate threats to their viability are further belied by the fact that dozens of major corporations, notably including nearly every major bank and financial institution, each of the major high-tech companies, and companies like Starbucks, have all undertaken major initiatives to adopt blockchain technologies and cryptocurrencies.  Among these are major Grant PUD customers and employers like Simplot, Mitsubishi Aircraft Corp./Aerotec, Amway/Nutralite, and Microsoft. Each of these companies is looking at blockchain solutions to improve the efficiency or safety of their operations.  For example, Simplot is considering blockchain as the technology that will allow it to trace food from the source on a particular farm to individual consumers.

4.35  Regulatory risk provides no reasonable basis for creating a distinction between cryptocurrency and other industries served by Grant PUD.  On the contrary, as recent events have made painfully clear, many old-line Washington industries face severe, and potentially fatal, regulatory risks.  For example, because of the countervailing tariffs imposed by many of the United States' major trading partners in response to tariffs imposed by the Trump Administration, the economic viability of major parts of the nation's agriculture industry are threatened and, with it, energy-intensive industries in Grant County that serve that industry, like cold storage facilities.

4.36  Many newer industries are also subject to regulatory risks that create greater risks to their viability than the regulatory risks faced by the cryptocurrency industry.  The most obvious example is the marijuana industry.  Marijuana grow

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 21

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

operations are energy-intensive, placing heavy loads on Grant PUD and other utilities. And, while the industry has been legalized in Washington, it remains a Schedule 1 controlled substance under federal law, and the industry in Washington has been allowed to grow only because federal authorities have agreed to refrain from enforcing federal criminal law with respect to activities that are within the parameters of the state law. This could end with the stroke of a pen, if the U.S. Attorney General rescinds the guidance documents limiting federal law enforcement activities.

4.37  Similar concerns arising from changes in trade regulation of the solar energy market threaten the viability of Grant County's major polysilicon manufacturing industry and have, in fact, forced the closure of a solar cell manufacturing facility in Moses Lake formerly served by Grant PUD that required far more electric power than all of the Plaintiffs combined. Yet in a recent Official Statement for Grant PUD bond offerings, Grant PUD recognized the risk that recent tariff disputes threatens Grant County's major silicon producer, REC Solar Grade Silicon LLC, but stated: "The District does not believe that loss of REC load would have a material impact on the District's finances" and that "[t]he Priest Rapids Project Power Sales Contracts contain provisions that, when coupled with the low production cost of the Priest Rapids Project, are expected to mitigate some or all of the impacts to the District from loss of quantities of retail electric load." If the loss of much larger quantities of load does not threaten Grant PUD's finances, it follows that the potential loss of load from Plaintiffs, who represent a much smaller quantity of load, is likewise immaterial got Grant PUD's finances.

4.38  Another major Grant industrial customer, Takata Airbags, recently declared bankruptcy and laid off nearly its entire workforce in Grant County as a

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 22

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

result of major liabilities accrued when it sold defective airbags to major automobile manufacturers over the course of a decade.

4.39  Accordingly, cryptocurrency service providers face "Business Risks" that are indistinguishable from, or less than, other industries Grant does not propose to be subject to Schedule 17.  While cryptocurrency prices have been volatile, as is common in any early-stage industry, Grant itself recognizes that price volatility is likely to decrease and industry stability is likely to increase after the industry has been in existence for seven years.  Bitcoin has now been in existence since 2009, nearly ten years.  Grant staff's justification for Rate Schedule 17 includes an assertion that cryptocurrency has been in existence as a commercial enterprise only since 2013, and this is simply incorrect.  But even if Grant were correct, the industry is now nearing the seven-year threshold cited by Grant with no indication that the industry will do anything but continue to grow.  In fact, in a recent survey of 141 executives from financial institutions such as banks and brokerage firms, 72% agreed that cryptocurrencies will continue into the foreseeable future, and a recent news report indicates that cryptocurrencies are on pace to transfer more value on a daily basis than MasterCard, the world's second-largest credit card company.  This belies the claim that cryptocurrencies face unique "business risks."

4.40  Other "established" industries face similar price volatility for their "primary output."  This includes old-line industries like aluminum smelting, which was once a major industry and the largest single consumer of electricity in Washington, but has largely disappeared due in large part to volatile and declining prices for primary aluminum.  Similarly, many other Grant PUD industrial customers face substantial "Business Risks."  This includes, but is not limited to, polysilicon manufacturers, who have seen the price for their primary product, solar

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 23

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

cells, drop precipitously over the past ten years due primarily to technological advances in manufacturing, and agricultural producers, who face volatile and often declining prices for their primary outputs.

4.41   Grant proposes to use "Porter's Five Forces" analysis to determine which businesses present unusual risks to Grant.  Porter's Five Forces analysis is based on: (1) ease of new entry into an industry; (2) threat of substitutes for the primary product of that industry; (3) bargaining power of customers; (4) bargaining power of suppliers; and, (5) industry rivalry, and is intended to measure the relative profitability of an industry, not its likelihood of failure.  It is impossible to meaningfully distinguish cryptocurrency services from any other industry served by Grant using these factors and, indeed, many industries that are considered relatively unprofitable under Five Forces analysis – airlines, agricultural commodities, and primary metals production are examples – have persisted for decades.  Further, Grant fails to recognize that individual actors within an industry are able to apply their core competencies, business model, or network to achieve a profit above the industry average.  Hence, Five Forces analysis inappropriately fails to recognize that the likelihood of failure of specific businesses is unrelated to the general Five Forces rating of the overall industry.

4.42   A comparison of the relative risks of Plaintiffs and the many other risky and volatile industries Grant serves without threat of assigning those industries to Rate Schedule 17 demonstrates that there is no meaningful distinction between Plaintiffs and those other industries, either in terms of the risks they create for Grant or the relative costs to serve those industries.  Accordingly, the risk-based assessments proposed by Grant as a gateway into Rate Schedule 17 are arbitrary and discriminatory.  The risk assessment is a thin veneer intended only to

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

disguise Grant's blatant rate discrimination and intention to drive cryptocurrency industries out of its service territory.

**E.   Rate Schedule 17 Imposes Rate Increases on Plaintiffs Exceeding 300%.**

4.43   Since opening their facilities in Grant County, each of the Plaintiffs has been served under Grant's Rate Schedule 7, which is for "Large General Service."   Under the current version of Schedule 7, the following rates are in effect:  A "Basic Charge" of $148.32 per month; energy charges of $0.021 per kWh for the first 50,000 kWh of consumption and $0.01857 per kWh for all additional monthly consumption; and a demand charge of $4.96 per kW of Billing Demand.  Each of these is unchanged from 2017 except that the per kW rate for consumption above 50,000 kWh was $0.01842 per kWh in 2017, which was raised by $0.00015 to $0.01857 in 2018.

4.44   Rate Schedule 17 will produce a huge spike in Plaintiffs' electricity costs.   Rate Schedule 17 includes massive increases in each of the billing determinants paid by Plaintiffs under Rate Schedule 7.  Astoundingly, the Demand Charge will increase more than 600% in three steps, from $4.96 per kW of Billing Demand under Rate Schedule 7 to $8.00 on April 1, 2019, $19 on April 1, 2020, and $30 on April 1, 2021.  The Basic Charge will increase nearly seven-fold, from $148.32 per month to $500 per month on April 1, 2019, $750 per month on April 1, 2020, and $1,000 per month on April 1, 2021.  The Energy Charge will likewise spike dramatically, reaching $0.03518 per kWh in 2021, an increase of more than 160% from the Energy Rate of $0.021 for the first 50,000 kWh of usage, and a near-doubling of the current Energy Rate of $0.01857 for consumption above 50,000 kWh.

4.45   The results will be devastating for Plaintiffs.   The PUD itself estimates that rates for those swept into Rate Schedule 17 will at least triple.  As

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 25

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

Commissioner Bernd recognized, "[t]hree hundred percent is a huge increase. These people [existing cryptocurrency operations] need to have some assurance they won't have to write off millions because we told them to leave." But that is exactly the effect of Rate Schedule 17.

4.46   The scale of the rate increase is demonstrated by a side-by-side comparison of the components of Schedule 7 and the EI rate schedule:

| Component | Schedule 7 Cost | EI Rate Schedule Cost | Percentage Increase |
|---|---|---|---|
| Basic Charge | $148.32 per month | $1,000 per month | **674%** |
| Energy Charge | $0.021 per kWh for first 50,000 kWh, $0.01857 per kWh thereafter | $0.03518 kwh | **167% for first 50,000 kWh, 190% for consumption above 50,000 kWh** |
| Demand Charge | $4.96 per kW-month | $30.00 per kW-month | **605%** |

4.47   This will result in rate increases in the range of 300% for each of the Plaintiffs, although the exact amount depends on the specific consumption patterns of each Plaintiff.  Estimates of the total rate increase for each Plaintiff  based on that Plaintiff's current consumption are as follows:

Blocktree:  400%

Corsair: 308%

Cytline: 303%

MIM: 300%

Miners United: 300%

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 26

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

Telco 214: 295%.

Vargas: 357% over 3 years at its Road M facility and 205% over 3 years at its Penn Street facility.

WeHash: 300%

4.48   Rate increases of this magnitude will render Plaintiffs' operations in Grant County uneconomical, forcing them to shutter their operations and move elsewhere to seek affordable power.  Plaintiffs' substantial investments in Grant County will be destroyed and the economic benefits they bring to the County will be lost.  Plaintiffs may even be forced into bankruptcy by these huge rate increases.

4.49   Imposing massive and crippling rate increases on Plaintiffs will produce exactly the outcome Schedule 17 is designed to prevent.  If Plaintiffs are forced to close their operations, Grant will suffer the loss of revenues Plaintiffs would otherwise pay to Grant for future power deliveries.  Thus, Rate Schedule 17 creates exactly the "future risk to Grant's revenue stream" it is supposedly intended to prevent.

## F.    There is No Cost-of-Service Justification for Rate Schedule 17.

4.50 There is no change in Grant PUD's cost of service that would justify these drastic rate increases.  On the contrary, Grant could easily continue to serve Plaintiffs from the major power sources available to it – primarily the Priest Rapids and Wanapum dams – for the foreseeable future.

4.51   Nor do Plaintiffs threaten Grant's future revenue stream.  At the time Plaintiffs moved to Grant County and placed their loads on Grant's electric system, Grant had substantial excess electrical capacity and there was no need for Grant to purchase additional power to serve Plaintiffs' loads.  Hence, Plaintiffs actually

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 27

increased the resiliency of Grant's long-term revenue stream by diversifying the local economy and increasing the security of Grant's revenue stream. Even if Plaintiffs stop taking service from Grant, Grant can resell its excess power on the wholesale market and, because wholesale prices at the Mid-Columbia market hub generally exceed Grant's costs of producing power, the risks that Grant will suffer a substantial loss of revenue as a result of Plaintiffs' leaving Grant's system are very small. Indeed, based on projections of Mid-C power prices contained in Grant County's Integrated Resource Plan, it is likely that Grant could resell the power at a substantial profit.

4.52   Further, Grant concedes that it takes in more revenue from customers taking service under Rate Schedule 7 than it costs to serve those customers. Grant projects that in 2018, it will take in $8.66 million in revenues from Schedule 7 customers but its cost to serve those customers will be only $8.25 million. Hence, revenues from Plaintiffs' rate class exceed costs by $0.41 million, approximately 5%.

4.53   Nor is there any prospect of a revenue shortage that would require Grant to raise its electric rates. On the contrary, Grant currently projects that its operating revenues for 2018 will be approximately 110% of the budget target.

4.54   Even if Grant were required to purchase power on the open market to serve its rising load from cryptocurrency security services and other high-tech data center operations, the rates contained in Rate Schedule 17 are still excessive given that cost of wholesale power in the Pacific Northwest markets has, since the end of the Enron crisis in the early 2000's, been generally low and stable, and Grant could access this power to serve growing loads. Further, under widely-accepted cost-causation principles governing utility rates, future load growth, not existing Grant

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 28

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

customers, including Plaintiffs, should be responsible for any increase in costs attributable to load growth.

4.55  The arbitrariness of Grant's policy is demonstrated by the fact that Grant continues to actively market to the data center industry and to sell substantial amounts of power to data centers in Grant County.  But the load characteristics of cryptocurrency service providers  are indistinguishable from load characteristics of data centers.  Both use large amounts of energy in a concentrated area with a very high load factor (that is, with little variation between peak demand and average demand).  In fact, many large data centers in Grant County lease rack space to cryptocurrency service providers, but whether a data center is running a cryptocurrency program or some other program cannot be distinguished based on any factor relevant to Grant PUD's cost of service.  Indeed, as data centers increasingly switch to the ASIC circuitry generally used by cryptocurrency service providers, any distinctions between data centers and cryptocurrency operations will become further blurred.

4.56  At the same time, Rate Schedule 17 is not intended to be applied to data centers and other energy-intensive industries although they place electric loads on Grant that in many cases are far larger than the 12.5 MW collectively placed on Grant by Plaintiffs.

4.57  Rate increases of the magnitude proposed in Rate Schedule 17 are nearly unheard of in this region.  In the past, large rate increases have been driven by extreme circumstances like the financial debacle surrounding construction of the Washington Public Power Supply System nuclear plants in the late 1970s and early 1980s or the Enron crisis of 2000-01.  In those cases, the rate increases were driven by changes in the cost of service underlying utility rates, and therefore were justifiable on cost-of-service grounds.  But unlike those crises, there is no

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 29

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

corresponding increase in cost of service to justify the rate increases that would be imposed under Rate Schedule 17. On the contrary, the cost of producing power from Grant's portfolio has not changed significantly and wholesale power rates in the Pacific Northwest have been consistently low, and with little volatility, for a number of years. Grant PUD's Integrated Resource Plan predicts that these market conditions will prevail for the foreseeable future.

4.58   Grant PUD staff claims that much of the increase in Rate Schedule 17 is driven by the need for expanded capacity on the electric transmission system. This is incorrect for at least four reasons: (1) staff's own analysis shows that existing transmission capacity is sufficient to serve Grant's existing cryptocurrency customers, including Plaintiffs; (2) as part of the process of interconnecting their facilities to Grant PUD's system, Plaintiffs paid up-front for necessary transmission upgrades, such as new substation facilities, and the up-front payment ensures that Grant's other customers will not bear the costs of these upgrades even if Plaintiffs were to fail in the future; (3) the rate methodology incorporated into Rate Schedule 17 will produce a massive over-recovery of revenues necessary to pay for the transmission used by Plaintiffs; and, (4) the rate methodology will also result in a double-recovery of Grant PUD's transmission costs.

**G.    Rate Schedule 17 Lacks Even Minimal Procedural Protections.**

4.59   Schedule 17 provides the PUD's staff with unlimited discretion to decide when and whether an industry is to be subject to Schedule 17. The schedule provides that "[n]o less than annually, a team composed of Grant PUD staff will review the [Evolving Industries] rate class to determine if it is appropriate for a customer's industry to move into or out of" the rate class, based on the staff's review of "pending State or Federal legislation" and "feedback" from unnamed "investment banks," "trends in price volatility of the industry's primary product, . .

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 30

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

. financial strength of market participants, and viability and competitiveness of industry," based "in part" on "Porter's Five Forces," an analysis intended to assess an industry's relative competitiveness and profitability, but not its viability. This creates the possibility that an industry could be moved arbitrarily back and forth between Schedule 17 and Grant's regular schedules at intervals of less than a year based on Staff's arbitrary determination that a customer's industry meets or does not meet the poorly-defined parameters for being an "evolving or unproven" industry. For the reasons described above, it is unlikely any industry could survive the resulting rate instability and repeated rate shocks.

4.60   Schedule 17 fails to provide even minimal protections for due process in the review process. No provision is made for public participation in the process, for submission of evidence or even comments, for controls on the quality of information used by Grant staff, or for appeals should staff act in error. Nor is there any provision for public notice of any proceeding in which an industry could be classified as "evolving" or any opportunity to participate in any such proceeding, or even any process to submit written comments. There is no provision for participation in the process by Grant's elected Board of Commissioners, let alone approval of staff's determinations in a public vote. Grant lacks any method for determining which data centers are running cryptocurrency security operations, as opposed to other kinds of data center operations, and has no method for determining which rate class "mixed" data centers – those that perform cryptocurrency-related operations as well as other kinds of data center operations – will fall into. In short, Schedule 17 makes Grant's unelected staff the judge, jury, and executioner of entire industries without even cursory due process protections.

4.61   The danger is illustrated by the fact that, during the hearing process leading to the adoption of Rate Schedule 17, one of Grant PUD's current

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

blockchain customers demonstrated mathematically that Rate Schedule 17 would result in a 400% over-recovery of Grant's cost to provide transmission service to Rate Schedule 17 customers, one of the major drivers of rates under that rate schedule, and that Rate Schedule 17 would also result in double-recovery of transmission costs.  The same customer pointed out basic mathematical errors in the staff's calculations.  The criticism was apparently ignored and, should Grant commit similar errors in the future, Rate Schedule 17 leaves the victim of those errors without recourse to either seek correction of the error by Grant PUD staff or to seek a remedy for the error in an appeals process.

4.62   Events since adoption of Rate Schedule 17 demonstrate that even the staff review promised in the rate schedule is a sham.  In fact, within hours of the Grant PUD Commission's final adoption of Rate Schedule 17 on August 28, 2018 – obviously before any of the analysis supposedly required under Rate Schedule 17 could be performed – Grant staff notified potential new customers that all cryptocurrency operations would be treated as "Evolving Industries" under Rate Schedule 17, but that no other industries would even be considered, with the possible exception of the marijuana industry, should it grow sufficiently to exceed the 5% load threshold in Rate Schedule 17.

4.63   This is true despite the fact that Grant staff has been unable to identify a means for distinguishing data center operations from cryptocurrency operations and has no method in place for treating data centers that provide both cryptocurrency services and other types of data center services.  This creates insuperable problems for administration of Rate Schedule 17, as demonstrated by Plaintiff Blocktree.  Blocktree's current operations in Grant County are devoted entirely to cryptocurrency security services, but Blocktree recently signed a contract with a major cancer research institution and will be converting part of its

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 32

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

operation into a data center to serve the cancer research client, with its operation fully converted to 2019.   This will not change the load Blocktree places on Grant PUD, Blocktree's load profile, or Grant PUD's cost to serve Blocktree, yet Blocktree's current operations will be classified as an "evolving industry" subject to rates approximately 300% higher than the rates it will pay for data center services to support cancer research since Grant's internal documents indicate it would not consider classifying anything other than cryptocurrency operations as "evolving industries."

4.64    Further, Grant PUD documents show that it estimates load from cryptocurrency service providers will be 20.05 aMW during 2018, while its total average load is projected to be 603 aMW. This means the 5% "concentration threshold" specified in Rate Schedule 17 is 30.15 aMW, more than 10 MW *below* the threshold for application of Rate Schedule 17 even before taking into account the recent bankruptcy of the firm GigaWatt due to internal management problems, which reduced Grant's cryptocurrency load by approximately 3 aMW.

4.65   The prospect of being moved in or out of the Rate Schedule by staff determinations that are beyond Plaintiffs' control, that could occur without notice at any time, that leave Plaintiffs without legal rights to challenge staff action, and that cannot be predicted creates uncertainty about the cost of Grant PUD's electric service that renders the business climate for cryptocurrency operations in Grant County untenable, even if they are not ultimately subject to Rate Schedule 17's massive rate increases.

**H.     Rate Schedule 17 Violates Internal Grant PUD Policies.**

4.66   In Resolution No. 8768, the PUD's Commissioners committed to setting rates based on cost of service principles that are well established and widely recognized in the electric industry, and adopted the following principles for setting

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 33

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

Grant's electric rates: (1) gradualism, that is, rates shall change  in "small, predictable increases"; (2) Large General Service customers shall receive preferential access to Grant's "low cost embedded power supply"; (3) rates are to be structured to avoid "rate shock"; (4) "[i]n a year that no general retail rate increase is put into effect, no increase will be applied to any schedule"; (5) rates will be based on cost of service analysis; (6) each rate class is to be set at not less than 0.25 times the average total annual increase in Grant's revenue requirement, and not more than 2.5 times that annual increase; and, (7) by December 31, 2023, the difference between the cost to serve each rate class and the expected revenue recovery from that class shall be between 15% positive and 20% negative.  Internal Grant PUD documents indicate that Grant understands Resolution No. 8768 to limit rate increases for existing customers like Plaintiffs to no more than 0.5% to 5% per annum.

4.67   For the reasons stated in Paragraphs 4.43 through 4.47, Rate Schedule 17 blatantly violates Grant's commitment to gradualism and to avoid rate shocks, as well as rates based on cost of service.

4.68   Each of the Plaintiffs is currently served under Grant's rate schedule for "Large General Service," and each is therefore entitled to preferential access to Grant PUD's low-cost embedded power supply under Resolution No. 8769.  Rate Schedule 17 would both deny Plaintiffs access to this low-cost power and force them to pay rates that are far above what can be justified on a cost-of-service basis for service from Grant's embedded low-cost supply.  Rate Schedule 17 therefore violates Grant's internal policies for this independent reason.

4.69   Rate Schedule 17 ignores the parameters set forth in Resolution No. 8769 requiring the rates for each Grant rate class to meet specific parameters related to the annual increase in Grant's revenue requirement and the permissible

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

differences between the cost of service of a rate class and the revenues collected from that rate class. Rate Schedule 17 violates each of these parameters.

4.70   By ignoring its own policies, Grant PUD acted arbitrarily and capriciously, and therefore improperly, in adopting Rate Schedule 17.

## I.   Rate Schedule 17 Is Motivated By Impermissible Animus Against Out-of-County   Economic Interests.

4.71   Rate Schedule 17 was adopted against a background of unprecedented hostility directed toward the cryptocurrency industry.   For example, during consideration of Rate Schedule 17 at the Grant PUD Commission meeting of July 24, 2018, existing Grant customers labeled cryptocurrency "a parasite providing few jobs and negligible tax base." The Port of Moses Lake on July 27 submitted a letter in support of Rate Schedule 17 that, while admitting that Grant is required to adopt "fair, equitable and non-discriminatory rates," expressed "disappointment" that the Commission had not at that time moved forward with Rate Schedule 17, asserting that cryptocurrency operations should be rejected in favor of other industries that supposedly provide more jobs and tax base.  The Port even falsely blamed cryptocurrency service providers for the Port's failure to attract two new industries that located elsewhere, a misstatement that one of the Grant PUD Commissioners corrected on the public record.  Similar, one Grant County resident supported Rate Schedule 17, which he understood to be aimed at "bitcoin miners," because "this rate signal a possible understanding for the many rate payer dislike for giving away our energy at cost to large out of county users for cashflow [sic]." Another Grant County citizen commented that "[o]ur precious energy resources should only be used to improve the quality of life of our residents and our county."

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

4.72   Responding to this public animus against cryptocurrency operations and in favor of local parochial interests, Grant PUD staff developed Rate Schedule 17 with the explicit intention of discriminating against cryptocurrency operations and in favor of traditional Grant customers.   The PUD staff's June 20, 2018, memorandum describing Rate Schedule 17 states that Rate Schedule 17 is intended to ensure "traditional customers' access to low cost embedded power supply," while forcing disfavored "evolving industries" to bear the higher costs of new power supplies, even if, like Plaintiffs, they arrived in Grant County when Grant PUD's power supply substantially exceeded its foreseeable needs and the favored customer arrived when additional power would be needed to serve that new customer, or to serve new demand from an old customer.

4.73   Similarly, the June 20 staff memorandum makes clear that Grant staff created "two customer connect queues," which would put customers unilaterally classified by Grant staff as  "evolving industries" into a queue that would be placed at the end of the line behind all other customers, and would allow favored customers to jump to the front of the line even if they filed applications after disfavored "evolving industries."   According to staff comments on the Grant PUD "White Paper" supporting Rate Schedule 17, moving cryptocurrency customers to the back of the bus was intended to "allow the District to get back to processing applications from traditional customers."

4.74   Imposition of Rate Schedule 17 on Plaintiffs will force them to shut down their operations in Grant County and move their cryptocurrency operations elsewhere, destroying the value of the investments Plaintiffs have made in Grant County, which total tens of millions of dollars, and creating the prospect that Plaintiffs will be forced into bankruptcy.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 36

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

4.75   Grant PUD staff adopted Rate Schedule 17 with reckless indifference to its legality.  Internal Grant PUD emails show that Grant staff concluded that Rate Schedule 17 would be effective in driving cryptocurrency businesses out of Grant County and that the PUD could "slow roll" any legal challenges.

4.76   If other utilities imposed the same crippling and discriminatory rate increases on cryptocurrency operations as Grant PUD, the industry would be destroyed.

## V.    FIRST CAUSE OF ACTION:
## FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION

5.1    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 4.76 of this Complaint.

5.2    Cryptocurrencies and blockchain technologies use the internet to instantly transmit information or to instantly undertake transactions occurring in interstate or international commerce.  Accordingly, cryptocurrencies move in and are intimately tied to interstate and foreign commerce.

5.3    Rate Schedule 17 is motivated by animus against cryptocurrency and blockchain businesses  based outside of Grant County that operate in interstate and international commerce and in favor of parochial local interests that seek to discriminate against Plaintiffs and other cryptocurrency and blockchain service providers by imposing crippling economic burdens on the cryptocurrency industry in order to economically benefit those parochial local interests.

5.4    Rate Schedule 17 creates unbearable burdens on interstate and international  commerce that cannot be justified by any permissible local governmental interest.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 37

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

5.5     If utilities outside Grant County adopted rate structures similar to Rate Schedule 17, interstate and international commerce using cryptocurrency and blockchain technology would be destroyed.

5.6     Rate Schedule 17 therefore imposes undue burdens on interstate and international commerce that violate the "dormant" Commerce Clause, U.S. Constitution, Art. 1, Sec. 8, cl. 3.

5.7     Rate Schedule 17 discriminates against cryptocurrency and blockchain businesses operating in interstate and international commerce and in favor of parochial local interests, which constitutes and independent violation of the "dormant" Commerce Clause, U.S. Constitution, Art. 1, Sec. 8, cl. 3, which protects interstate commerce from precisely this kind local economic favoritism.

5.8     Plaintiffs are entitled to injunctive relief and a declaratory judgment that Rate Schedule 17 violates both the international and interstate commerce provisions of the Commerce Clause and is therefore without force and effect.

## VI.    SECOND CAUSE OF ACTION:
## VIOLATION OF DUE PROCESS CLAUSES OF THE
## UNITED STATES CONSTITUTION

6.1     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 5.8 of this Complaint.

6.2     Rate Schedule 17 authorizes Grant PUD staff to move any industry into or out of Rate Schedule 17 at any time without even basic due process.  There is no provision for public notice of staff action, no provision for participation of potentially affected parties through comment or otherwise, no right of appeal, no standards for the evidence that could be used by Grant staff, and no other procedural protections.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 38

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

6.3    Imposition of the huge rate increases contemplated by Rate Schedule 17 will deprive Plaintiffs of their property by massively and unjustifiably increasing their electric rates, thereby destroying the millions of dollars of investments they have made in Grant County.

6.4    Because Rate Schedule 17 would deprive Plaintiffs of their property without due process of law, it violates the Fifth Amendment to the U.S. Constitution and clause 1 of the Fourteenth Amendment to the U.S. Constitution.

6.5    In applying Rate Schedule 17, Plaintiffs have been accorded no due process whatsoever.    Instead, Grant PUD staff simply declared cryptocurrency industries to be "evolving industries" subject to Rate Schedule 17 without conducting any of the analysis or applying any of the tests supposedly required by Rate Schedule 17, without notice, without hearing, and without any other semblance of due process.

6.6    While Rate Schedule 17 was ostensibly created to address any "evolving industry," it was in fact created with the explicit intention of rendering cryptocurrency businesses in Grant County uneconomic and the process created by Grant PUD was merely a figleaf to disguise this specific intent.    Grant PUD therefore violated Plaintiffs' rights to substantive due process in both the formation and execution of Rate Schedule 17.

6.7    Plaintiffs are entitled to injunctive relief and a declaratory judgment that Rate Schedule 17 violates Due Process as guaranteed by the United States Constitution, and that Rate Schedule 17 is therefore without force and effect.

### VII.   THIRD CAUSE OF ACTION:
### FOR DAMAGES AND ATTORNEYS' FEES AND COSTS
### UNDER 42 U.S.C. §§ 1983 & 1988.

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

7.1    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 6.7 of this Complaint.

7.2    Because Grant PUD is operating under the color of state law to deprive Plaintiffs of their rights under the U.S. Constitution, Plaintiffs are entitled to damages in amount to be proven at trial under 42 U.S.C. § 1983, and for attorneys' fees and costs under 42 U.S.C. § 1988, in an amount to be proven at trial.

## VIII.  FOURTH CAUSE OF ACTION:
## VIOLATION OF SECTION 20 OF THE FEDERAL POWER ACT

8.1    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 7.2 of this Complaint.

8.2    Grant PUD holds a federal hydroelectric license for the Priest Rapids Project, FERC License No. 2114, issued by the Federal Energy Regulatory Commission under Part I of the Federal Power Act, 16 U.S.C. § 791a-823d.

8.3    Power generated at the Priest Rapids Project, which includes both the Priest Rapids and Wanapum dams, flows in interstate commerce.

8.4    Section 20 of the Federal Power Act requires that "the rates charged and the services rendered" by any entity holding a federal hydroelectric license "shall be reasonable, nondiscriminatory, and just to the customer and all unreasonable, discriminatory and unjust rates or services are prohibited and declared to be unlawful." 16 U.S.C. § 813.

8.5    The rates to be charged by Grant PUD under Rate Schedule 17 are unreasonable, discriminatory, and unjust, and are therefore proscribed by Section 20 of the Federal Power Act.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 40

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

8.6    Plaintiffs are therefore entitled to injunctive relief and a declaratory judgment that Rate Schedule 17 violates the Federal Power Act and is therefore void and without force or effect, and to an award of attorneys' fees, as authorized by Section 20 of the Federal Power Act.

## IX. FIFTH CAUSE OF ACTION:
## FOR INJUNCTIVE AND DECLARATORY RELIEF BARRING
## IMPROPER DELEGATION UNDER RCW 54.24.080

9.1    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 8.6 of this Complaint.

9.2    Grant County PUD is a creature of statute and its authorities are governed by and limited to those provided in its organic statute, RCW Title 54.

9.3    RCW 54.24.080 requires that "*[t]he commission* of each district" established under Title 54 "shall have the power and shall be required to establish, maintain, and collect rates or charges for electric energy and . . . facilities, and commodities sold, furnished, or supplied by the district."

9.4    Rate Schedule 17 improperly delegates to the Grant PUD staff the functions assigned solely to the Grant PUD Commission under RCW 54.24.080 because it allows the Grant staff to unilaterally, and without oversight or approval by Grant PUD's elected Commissioners, determine whether an industry is subject to Rate Schedule 17's extreme and devastating rate increases.

9.5    Plaintiffs are therefore entitled to an injunction and a declaration that Rate Schedule 17 violates RCW 54.24.080 and Grant PUD is therefore barred from implementing Rate Schedule 17.

## X.    FIFTH CAUSE OF ACTION:
## FOR INJUNCTIVE AND DECLARATORY RELIEF
## BARRING UNFAIR AND DISCRIMINATORY RATES UNDER RCW
## 54.24.080

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

10.1   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 9.5 of this Complaint.

10.2   Under RCW 54.24.080, Grant's electric rates are required to be "fair," "non-discriminatory," and "adequate" to recover its costs of providing electric service.

10.3   Rate Schedule 17 is not "fair" and violates the "adequacy" requirement because it requires Plaintiffs to pay rates that are far above Grant PUD's cost of serving Plaintiffs.

10.4   Rate Schedule 17 is discriminatory because it fails to require similarly-situated customers to pay the same electricity rates.  Rate Schedule 17 is based on "risk premiums" supposedly arising from cryptocurrency and blockchain security services' status as an "evolving" and "unproven" industry, and the concomitant threats to Grant's "future revenue stream," but Grant PUD's own documents demonstrate that many other Grant PUD customers present the same or greater risks to Grant's future revenue streams.  Further, data centers and other energy-intensive industries Grant continues to actively court are indistinguishable from Plaintiffs, both physically and in terms of Grant's cost to serve these customers.  Grant's attempt to single out cryptocurrency and blockchain businesses for crippling rate increases is a paradigmatic example of the kind of utility conduct the non-discrimination principle was designed to prevent – imposing crippling economic burdens on disfavored industries to create artificial benefits for industries favored by the utility.

10.5   Rate Schedule 17 violates every other standard principle of utility rate-making. Rate Schedule 17 violates cost-of-service principles both because it imposes rates without any basis in the cost of serving Plaintiffs and imposes

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

different rates on customers with similar costs of service. The "risk premiums" that lie at the heart of Rate Schedule 17 are based on arbitrary assumptions about the cryptocurrency/blockchain industry that fail to reflect the up-front protections against default that Plaintiffs have provided the PUD, that fail to recognize the differences in risk represented by stronger and weaker competitors within an industry, and that fail to reflect demonstrated, actual costs of serving Plaintiffs, as opposed to speculation about possible future events.

10.6    Rate Schedule 17 violates the gradualism principle because it imposes rate increases of approximately 300% on Plaintiffs, creating "rate shock" and threatening the viability of Plaintiffs' enterprises. There is no change in the underlying costs of service that could justify that 300% rate increase. On the contrary, the costs of providing service to Plaintiffs has remained essentially unchanged.

10.7    Plaintiffs are therefore entitled to an injunction and a declaration that Rate Schedule 17 violates RCW 54.24.080 and Grant PUD is therefore barred from implementing Rate Schedule 17.

## XI.    SIXTH CAUSE OF ACTION:
## FOR INJUNCTIVE AND DECLARATORY RELIEF
## BECAUSE RATE SCHEDULE 17 ARBITRARILY AND CAPRICIOUSLY
## IGNORES GRANT PUD'S INTERNAL POLICIES

11.1    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 10.7 of this Complaint.

11.2    A fundamental precept of the law governing government action in our state is that government agencies, including PUDs, are bound to follow their own policies, and that a government agency failing to follow its own policies acts arbitrarily and capriciously, and therefore illegally.

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700 fax: 206 587 2308

11.3   On May 12, 2015, Grant PUD's Board of Commissioners adopted Resolution No. 8768, which obligates the PUD to follow ordinary standards of rate-setting in developing its electric rates, including: (1) gradualism: (2) avoiding "rate shock"; and (3) basing rates on the cost of serving customers in each rate class.

11.4   Rate Schedule 17 violates each of the principles referenced in Paragraph 11.3.

11.5   Resolution No. 8768 also requires that, "[i]n a year that no general retail rate increase is put into effect, no increase will be applied to any schedule." Rate Schedule 17 violates this principle because it imposes rate increases of approximately 100% in 2019, 2020, and 2021, without any indication that rate increases will be imposed on any other rate class. Indeed, every indicator suggests that Grant PUD's rates are currently sufficient to recover required revenues and there will be no need for general rate increases for each of the next three years.

11.6   Resolution No. 8768 also commits Grant to ensure that rates will be set for each rate class that recover at least 0.25 times the average total annual increase in Grant's revenue requirement, and not more than 2.5 times that annual increase.  Resolution No. 8768 also commits Grant, by December 31, 2023, to rates that are structured to that difference between the cost to serve each rate class and the expected revenue recovery from that class shall be between 15% positive and 20% negative.  Rate Schedule 17 falls well outside these parameters and is arbitrary and capricious because it violates Grant's own internal policies.

11.7   Plaintiffs are therefore entitled to injunctive relief and a declaration that Rate Schedule 17 is arbitrary and capricious and therefore invalid, void, and of no force and effect.

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

## XII.   SEVENTH CAUSE OF ACTION:
## FOR INJUNCTIVE AND DECLARATORY RELIEF
## BECAUSE RATE SCHEDULE 17 VIOLATES
## ARTICLE 1, SECTION 3 OF THE WASHINGTON CONSTITUTION

12.1   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 11.7 of this Complaint.

12.2   The Washington Constitution's "Declaration of Rights" sets forth rights that are fundamental to the citizens of this state.  Among these are Art. 1, Sec. 3, which guarantees that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

12.3   For the reasons set forth in Paragraphs 4.71 through 4.73, Rate Schedule 17's massive rate increases will deprive Plaintiffs of their property.

12.4   Rate Schedule 17 does not provide even rudimentary procedural protections such as notice, the right of participation, and the right of appeal.

12.5   Rate Schedule 17 therefore will result in a denial of Plaintiffs' right to property without due process of law as required under Washington Constitution Article 1, Section 3.

12.6   While Rate Schedule 17 was ostensibly created to address any "evolving industry," it was in fact created with the explicit intention of rendering cryptocurrency businesses in Grant County uneconomic and the process created by Grant PUD was merely a figleaf to disguise this specific intent.   Grant PUD therefore violated Plaintiffs' rights to substantive due process under the Washington Constitution in both the formation and execution of Rate Schedule 17.

12.7   In applying Rate Schedule 17, Plaintiffs have been accorded no due process whatsoever.   Instead, Grant PUD staff simply declared cryptocurrency industries to be "evolving industries" subject to Rate Schedule 17 without

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 45

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

conducting any of the analysis or applying any of the tests supposedly required by Rate Schedule 17, without notice, without hearing, and without any other semblance of due process.

12.8   Plaintiffs are therefore entitled to injunctive relief and a declaration that Rate Schedule 17 violates Plaintiffs' fundamental right to due process of law and therefore is void and of no force.

12.9   Plaintiffs are entitled to an award of damages for violations of their rights to substantive due process in an amount to be proven at trial.

## XIII. EIGHTH CAUSE OF ACTION:
## FOR INJUNCTIVE AND DECLARATORY RELIEF
## BECAUSE RATE SCHEDULE 17 VIOLATES
## ARTICLE 1, SECTION 12 OF THE WASHINGTON CONSTITUTION

13.1   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1.1 through 12.9 of this Complaint.

13.2   In addition to the due process clause discussed in Section XI, the Washington Constitution's "Declaration of Rights" also includes a privileges and immunities clause, Art. 1, Sec. 12, guaranteeing that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

13.3   Rate Schedule 17 is intended to impose enormous rate increases on a small and distinct group, Plaintiffs and others in Grant County engaged in cryptocurrency security service operations, thus depriving them of the right to reasonable cost-based power enjoyed by all other citizens of Grant County and threatening to destroy their investments in Grant County.

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 46

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

13.4    Rate Schedule 17 is explicitly intended to reserve the privileges of low-cost power for the existing, politically-favored customers of Grant PUD, while denying those privileges to Plaintiffs and others in their industry.

13.5    Rate Schedule 17 therefore violates Washington Constitution Article 1, Section 12.

13.6    Plaintiffs are therefore entitled to injunctive relief and a declaration that Rate Schedule 17 violates the privileges and immunities clause of the Washington Constitution and is therefore void and of no force and effect.

**PRAYER FOR RELIEF**

Having set forth their claims above, Plaintiffs pray for relief as follows:

A.    Preliminary and permanent injunctions barring Defendant from implementing Rate Schedule 17;

B.    A declaration that Rate Schedule 17 violates the U.S. Constitution, the Federal Power Act, the Washington Constitution, Title 54 of the Revised Code of Washington, and Grant County PUD's own internal policies, and therefore is void and unenforceable;

C.    An award of damages under 42 U.S.C. § 1983 an amount to be demonstrated at trial;

D.    An award of attorney's fees and costs under  42 U.S.C. § 1988 and 16 U.S.C. § 813; and

E.    For such other relief as the Court may deem just and appropriate.

//

//

//

//

COMPLAINT SEEKING DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES - 47

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308

DATED this 19th day of December, 2018.

CAIRNCROSS & HEMPELMANN, P.S.


/s/ *Eric L. Christensen*
Eric L. Christensen, WSBA No. 27934
524 Second Avenue, Suite 500
Seattle, WA  98104-2323
Telephone: (206) 587-0700
Facsimile: (206) 587-2308
E-mail: echristensen@cairncross.com


/s/ *Jonathan D. Tebbs*
Jonathan D. Tebbs, WSBA No. 53861
Attorney for Plaintiffs
524 Second Avenue, Suite 500
Seattle, WA  98104-2323
Telephone: (206) 587-0700
Facsimile: (206) 587-2308
E-mail:  jtebbs@cairncross.com

Attorneys for Plaintiffs

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700 fax: 206 587 2308