1

2

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WASHINGTON

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 29, 2019

SEAN F. McAVOY, CLERK

3

4

5

6

7

8

9

10

11

BLOCKTREE PROPERTIES, LLC, a
Washington limited liability company;
CORSAIR INVESTMENTS, WA,
LLC, a Washington limited liability
company; CYTLINE, LLC, a Delaware
limited liability company; 509 MINE,
LLC, a Washington limited liability
company; MIM INVESTORS, LLC, a
Washington limited liability company;
MINERS UNITED, LLC, a
Washington limited liability company;
TELCO 214 WHOLESALE
SOFTWARE, INC, a Washington
corporation; MARK VARGAS, an
individual; WEHASH
TECHNOLOGY, LLP, a Washington
limited liability company;

12

                    Plaintiff,

13        v.

14

15

16

17

18

19

20

21

PUBLIC UTILITY DISTRICT NO. 2
OF GRANT COUNTY
WASHINGTON, a Washington
municipal corporation; TERRY
BREWER, individually and in his
official capacity; BOB BERND,
individually and in his official capacity;
DALE WALKER, individually and in
his official capacity; TOM FLINT,
individually and in his official capacity;
LARRY SCHAAPMAN, individually
and in his official capacity; DOES 1-10,
managers and employees of Grant PUD,
individually and in their official
capacities,

                    Defendants.

NO:  2:18-CV-390-RMP


ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 1

BEFORE THE COURT is Plaintiffs' Motion for Preliminary Injunction, ECF No. 25.  Plaintiffs, a group of technology firms primarily engaged in the business of cryptocurrency mining, asked this Court to enjoin Grant County PUD No. 2 from implementing its "Evolving Industries" electricity rate class, which substantially increases the cost of electricity supplied to "evolving industries," including Blocktree and other Grant County cryptocurrency miners.  The Court finds that Blocktree has failed to show that they will suffer irreparable harm unless a preliminary injunction is imposed.  Further, Blocktree is not likely to succeed in showing that Rate Schedule 17 is discriminatory or arbitrary, that their classification as an evolving industry was made without due process, or that the District's actions violated Blocktree's right to carry on a business under the Washington State Constitution's Privileges and Immunities Clause.  Therefore, the Court denies Blocktree's request for a preliminary injunction.

## BACKGROUND

### *Cryptocurrency Mining and Blockchain Technology*

Plaintiffs Blocktree Properties, LLC; Corsair Investments WA, LLC, Cytline, LLC; 509 Mine, LLC, MIM Investors, LLC; Miners United, LLC; Telco 214 Wholesale Software, Inc.; Mark Vargas; and WeHash Technology, LLP (collectively, "Blocktree") are a group of technology firms that provide verification and security services for blockchain-based cryptocurrencies.  ECF No. 25 at 11. Cryptocurrencies are digitally-based currency that exist solely on the internet and are

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 2

1   unregulated and unmanaged by third parties, such as banks or governments.  ECF

2   No. 1 at 7–8.  The blockchain is the data structure through which cryptocurrency

3   transactions are identified, tracked, and shared across networks of computers,

4   working as a digital ledger.  *Id.*  Supporters of cryptocurrencies claim that the

5   blockchain allows for more secure and transparent monetary transactions than

6   traditional payment methods.  *Id.*

7        For the blockchain to track cryptocurrency transactions, the transactions must

8   be verified by independent blockchain participators.  ECF No. 1 at 7–8.  Blockchain

9   verifiers, also known as cryptocurrency miners, are given the chance to verify

10  cryptocurrency transactions by solving complicated mathematical problems.  *Id.*

11  The first miner to solve the problem, and then verify the transaction on the

12  blockchain, is rewarded with a small amount of cryptocurrency.  *Id.*  Miners rely on

13  advanced and specialized computer hardware to successfully mine cryptocurrency

14  before others can secure the cryptocurrency reward for themselves.  *Id.*

15       Because cryptocurrency mining is technologically complex and requires

16  advanced equipment, one of a miner's biggest expenses is electricity.  ECF No. 1 at

17  9.  Cryptocurrency miners work to reduce their power bills by locating their

18  operations in areas with inexpensive and reliable access to high amounts of

19  electricity.  ECF No. 37-6 at 99.

20  ***Grant County PUD No. 2's Relationship with Cryptocurrency Miners***

21       Defendants are Grant County Public Utility District Number 2, its

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 3

1    Commissioners, and staff (collectively, "the District").  ECF No. 1 at 6–7.  The

2    Public Utility District is established under Title 54 of the Revised Code of

3    Washington and operates as a municipal corporation at the direction of elected

4    Commissioners, who are assisted by hired staff.  ECF No. 37 at 9.  The District

5    boasts one of the least expensive power rates in the country due to its close

6    proximity to reliable energy sources, such as the Grand Coulee Dam.  ECF No. 32-1

7    at 656.  Blocktree, drawn to the District by the affordable and reliable electricity, set

8    up operation centers in the District over the previous five years.  ECF No. 25 at 11.

9        The District charges its customers for power based on the customers'

10    operations and power consumption.  ECF No. 37 at 9.  Customers of similar

11    industries and operations are grouped into rate classes and are charged for power

12    under the rates imposed on each class.  *Id.*  Currently, Blocktree is charged under

13    Rate Schedule 7 ("RS-7"), which is the rate for large general service customers who

14    use between 200 kW[1] and 5,000 kW of power a month.  ECF No. 37-6 at 4–5.

15        The District contends that it received unprecedented interest from

16    cryptocurrency miners in the summer of 2017.  ECF No. 37-6 at 7.  Since 2017, the

17

18    [1] The measuring unit "kW" refers to "kilowatt," which is used to measure power.
A kilowatt is 1,000 watts (the basic measuring unit of power) and a megawatt

19    ("MW") is 1,000 kilowatts or 1,000,000 watts.  Billing rates are calculated using
"kilowatt hours" ("kWh"), a unit for measuring power consumption.  A device that

20    consumes one kW of constantly-supplied power for one hour consumes one kWh.
ECF No. 25 at 8.  Outputs of power from electrical systems owned and operated by

21    utility districts are calculated using average megawatts ("MWa").  *Id.*

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 4

District states that it has received interest from over 125 cryptocurrency mining companies, which the District equates to 1,500 MW of power, more than double the District's average load of 600 MWa. *Id.* The District became worried that the large number of cryptocurrency miners would overload the District's power systems and inhibit the District's ability to supply power to all of its customers. *Id.* at 8. Additionally, the District was worried about the risks imposed by the uncertainties in the cryptocurrency mining industry and whether the miners' failure to profit from the activity would result in a failure to pay high power bills, leaving the rest of the District's customers responsible for the unpaid electricity. *Id.* at 10.

To address the issues generated by the growing interest from cryptocurrency miners, the District developed two different strategies. The first was known as a two-queue approach. ECF No. 37-6 at 13. Under the two-queue approach, "traditional" customers are placed in one queue for electricity, and those belonging to an "evolving industry," such as cryptocurrency miners, are placed in another queue. *Id.* The District would service the traditional customers before servicing those in the evolving industry queue. *Id.* The second strategy developed by the District was the evolving industry rate class, whose electricity bills would be calculated under the newly-developed Rate Schedule 17 ("RS-17"). *Id.* at 16.

***Rate Schedule 17***

The District's hired staff began the creation of RS-17 in late 2017 as an approach to handle the sudden interest from cryptocurrency mining companies. ECF

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 5

No. 37-6 at 11.  On April 24, 2018, the staff, in a public presentation, recommended that the Commissioners establish a new rate schedule for industries like cryptocurrency mining that face certain viability risks while simultaneously consuming a relatively large portion of the District's power load.  *Id.* at 64.  On May 8, 2018, the Commissioners approved the creation of an evolving industry class by passing Resolution No. 8885.  *Id.* at 75.

Following Resolution No. 8885, the District's staff drafted a memorandum describing the problems presented by the rapidly-growing cryptocurrency mining industry and how the new rate class, authorized by the Resolution, could potentially solve those issues.  ECF No. 37-6 at 90.  The staff recommended that customers would be placed into the "evolving industry" category, and therefore subjected to the secondary queue and RS-17, if the industry in question showed certain risks.  The District classified the risks into three categories, as quoted from the memorandum:

> Regulatory Risk – Risk of detrimental changes to regulation with the potential to render the industry inviable within a foreseeable time horizon.
>
> Business Risk – Potential for cessation or significant reduction of service due to a concentration of business risk, in an evolving or unproven industry, in the value of the customer's primary output.
>
> Concentration Risk – Potential for significant load concentration within Grant PUD's service territory resulting in a meaningful aggregate impact and corresponding future risk to Grant's revenue stream. Evaluation would begin to occur when industry concentration of existing and service request queue customer loads exceeds 5% of Grant PUD's total load.

*Id.* at 91.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 6

1    The staff recommended that an industry be categorized as an evolving

2    industry if the industry showed a concentration risk and one of the other two risks,

3    and that the District evaluate an industry's placement in the evolving industry

4    category on an annual basis. ECF No. 37-6 at 91. For regulatory risk, the District

5    would consider pending state and federal legislation, regulatory rulings from state

6    and federal agencies, and feedback from investment banks. *Id.* For business risk,

7    the District would consider trends in the price volatility of the industry's primary

8    product, the financial strength of market participants, and the viability and

9    competitiveness of the industry based on the threat of new entrants, threat of

10   substitutes, bargaining power of customers, bargaining power of suppliers, and

11   industry rivalry. *Id.* For concentration risk, the District would consider whether all

12   customers within the industry use 5% or more of the District's power load. *Id.*

13   After another public meeting on June 26, 2018, the Commissioners adopted RS-17

14   by passing Resolution No. 8891 on August 28, 2018. *Id.* at 111. Thereafter,

15   cryptocurrency mining was classified as an evolving industry, subject to the

16   secondary queue and RS-17. ECF No. 32-1 at 490.

17   The rate charged for electricity under RS-17 is significantly higher than the

18   rate charged under RS-7. As a result, the District decided to incrementally

19   implement RS-17. ECF No. 37-6 at 113. The District will begin charging RS-17

20   rates to evolving industry customers on April 1, 2019. *Id.* The rate will increase on

21   April 1, 2020, and then increase again to its full rate on April 1, 2021. *Id.* Rates are

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 7

calculated on a monthly basis by totaling three separate charges: a Basic Charge, which is a flat monthly fee; an Energy Charge, which is a fee calculated based on the amount of power used by the customer in the billing month; and a Demand Charge, which is a fee calculated based on the most amount of power that the customer needed at the customer's peak power consumption over a 15-minute period. ECF No. 37-6 at 4–5. The following chart shows the increase in electricity prices that Blocktree must pay as RS-17 is incrementally implemented:

|  | RS-7 | RS-17B (April 2019) | RS-17B (April 2020) | RS-17B (April 2021) |
|---|---|---|---|---|
| **Basic Charge** | $148.32/month | $500/month | $750/month | $1,000/month |
| **Energy Charge** | $0.02100 per kWh for the first 50,000 kWh; $0.01875 per kWh thereafter | $0.02219 per kWh | $0.02465 per kWh | $0.03518 per kWh |
| **Demand Charge** | $4.96/kW | $8.00/kW | $19.00/kW | $30.00/kW |

*Id.* at 113. According to Blocktree, once RS-17 is fully implemented, their electricity expenses will increase between 295% and 400%. ECF Nos. 26–31; 36-1.

**The Miners' Objections to the Evolving Industry Classification and RS-17**

Throughout the development and implementation of the evolving industry class and RS-17, Blocktree voiced its objections. Blocktree submitted written comments to the District, arguing that the classification was unnecessary and that cryptocurrency miners should not be placed within that classification. ECF No. 37-6 at 99–106. They also appeared at several public presentations to voice their

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 8

1  objections to RS-17.  *Id.* at 16–18.  Blocktree argued that the District developed the

2  evolving industries classification and RS-17 based on misconceptions and

3  misunderstandings about the cryptocurrency mining industry.  *Id.* at 99–106.

4  Blocktree also voiced concerns that the District was using the evolving industries

5  classification and RS-17 to discriminate against cryptocurrency miners based on

6  public opposition to the mining operations.  *See* ECF No. 32-1 at 389–393.

7       After RS-17 was implemented and cryptocurrency mining was classified as an

8  evolving industry, Blocktree filed the present lawsuit against the District.  ECF No.

9  1.  Blocktree claims that the District violated the dormant Commerce Clause, the

10  Due Process Clauses of the United States and Washington State Constitutions, the

11  Federal Power Act, Washington's utility laws, the District's own internal policies,

12  and the Washington State Constitution's Privileges and Immunities Clause.  *Id.* at

13  37–47.

14       In the present Motion for Preliminary Injunction, Blocktree asks this Court to

15  enjoin the implementation of RS-17, set to begin on April 1, 2019, throughout the

16  litigation.  ECF No. 25.  Blocktree argues that they are likely to succeed on the

17  merits of their claims.  *Id.* at 21–35.  Blocktree also argues that they will suffer

18  irreparable harm because RS-17 will raise their power costs sufficiently to cause

19  them to go bankrupt; that the equities are in their favor; and that a preliminary

20  injunction will further the public interest.  *Id.* at 35–40.

21

**LEGAL STANDARD**

To succeed in securing a preliminary injunction, the moving party must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, courts weigh these factors "on a sliding scale, such that where there are only serious questions going to the merits—that is, less than a likelihood of success on the merits—a preliminary injunction may still issue so long as the balance of hardships tips *sharply* in the plaintiff's favor and the other two factors are satisfied." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (internal quotations omitted) (emphasis in original).

As with any equitable relief, a preliminary injunction or temporary restraining order generally is not appropriate where adequate legal remedies are available. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."). A preliminary injunction is an "extraordinary and drastic remedy" that may be granted only upon a "clear showing" that the movant is entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Nat'l Steel Car, Ltd. v. Canadian P. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) ("A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted.") (internal quotation omitted).

# DISCUSSION

### *Likelihood of Success on the Merits*

Blocktree argues that they are likely to succeed with three different claims against the District.  First, they argue that RS-17 violates both Washington State and federal law because it discriminates against cryptocurrency miners.  ECF No. 25 at 21.  Second, they argue that the process by which the District implemented RS-17 and determined that cryptocurrency mining was an "Evolving Industry" violated Blocktree's due process rights.  *Id.* at 29.  Third, Blocktree argues that RS-17 violates the Privileges and Immunities Clause of the Washington State Constitution. *Id.* at 33.

### *Washington Public Utility Rate-Setting Laws*

The parties dispute whether Blocktree is likely to succeed on the merits of their rate discrimination claim under Washington law.  ECF No. 25 at 21; ECF No. 37 at 17.

The District is a municipal corporation established pursuant to Washington statutes.  Wash. Rev. Code § 54.04.020.  Municipal corporations are limited in powers "to those necessarily or fairly implied in or incident to the powers expressly granted, and also those essential to the declared objects and purposes of the corporation[s]."  *Port of Seattle v. Wash. Utils. And Transp. Comm'n*, 597 P.2d 383, 386 (Wash. 1979).  A municipal corporation may not act contrary to express statutory or constitutional limitations.  *City of Tacoma v. Taxpayers of City of*

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 11

*Tacoma*, 743 P.3d 793, 801 (Wash. 1987).  If a utility operates within its statutory

and constitutional boundaries, judicial review of a utility's action is limited to

whether the action was arbitrary, capricious, or unreasonable.  *Id.*  An action is

arbitrary or capricious when it is "willful and unreasoning and taken without regard

to the attending facts or circumstances."  *Hillis v. State Dep't of Ecology*, 932 P.2d

139, 144 (Wash. 1997).  Further, an action is arbitrary and capricious when "there is

no support in the record for the action."  *Dorsten v. Port of Skagit Cty.*, 650 P.2d

220, 224 (Wash. 1982).

As a municipal corporation, the District retains the "full and exclusive

authority to sell and regulate and control the use, distribution, rates, services, and

price" of providing electricity to inhabitants of the District.  Wash. Rev. Code §

54.16.040.  Those rates and charges must be fair and nondiscriminatory.  Wash. Rev.

Code § 54.24.080(1).

Blocktree presented six different arguments as to why RS-17 violates

Washington's utility laws.  ECF No. 25 at 21.  First, they argue that the District

staff's ability to classify a group of customers as an "evolving industry" violates the

text of section 54.24.080(1).  *Id.* at 24–25.  According to Blocktree, the District

staff's determination that an industry qualifies as an "evolving industry" for the

purposes of imposing RS-17 amounts to an unconstitutional delegation of

lawmaking authority to the staff.  ECF No. 25 at 25.  The District argues that they

have "broad authority" to make decisions on ratemaking.  ECF No. 37 at 17–18.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 12

1    In Washington, legislative power may be delegated to other governing bodies

2  if (1) the legislature provides standards or guidelines which define, in general terms,

3  what is being delegated and what body holds the delegated authority; and (2)

4  procedural safeguards exist to prevent arbitrary action or abuse of discretionary

5  power by the body receiving the delegation.  *Barry & Barry, Inc. v. State Dep't of*

6  *Motor Vehicles*, 500 P.2d 540, 542–43 (Wash. 1972).  The *Barry* test was first

7  formulated to prevent abuse of delegation by unelected executive branch officials.

8  *See id.*  The *Barry* test equally applies to public utility commissions.  *Earle M.*

9  *Jorgensen Co. v. City of Seattle*, 665 P.2d 1328, 1333 (Wash. 1983).

10   Blocktree argues that they are likely to succeed on both prongs of the *Barry*

11  test.  ECF No. 25 at 24–25.  Under the first prong, Blocktree argues that section

12  54.24.080(1) delegates the authority to set rates to the District, rather than the

13  District's staff, and that the District failed to follow the statutory directives when

14  cryptocurrency mining was classified as an evolving industry.  *Id.*  Under the second

15  prong, Blocktree argues that their placement into RS-17 as an evolving industry

16  lacked procedural safeguards intended to control arbitrary action.  *Id.*

17   Regarding the first prong of the *Barry* test, section 54.24.080(1) reads as

18  follows:

19       The commission of each district which shall have revenue obligations
       outstanding shall have the power and shall be required to establish,
20      maintain, and collect rates or charges for electric energy and water and
       other services, facilities, and commodities sold, furnished, or supplied
21      by the district.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 13

1   Wash. Rev. Code § 54.24.080(1).

2       While a significant amount of work was done by the District's hired staff in

3   developing and implementing RS-17, the decisions to create and adopt the rate

4   schedule were ultimately made by the Commissioners.  After a public presentation

5   by the staff to the Commissioners, the Commissioners directed the staff to develop

6   an evolving industry classification and RS-17.  ECF No. 37-6 at 75 (Resolution No.

7   8885).

8       The Commissioners later officially adopted and implemented RS-17 by

9   unanimously passing Resolution No. 8891.  *Id.* at 111.  The Commission knew that

10  cryptocurrency miners would be placed in RS-17, because RS-17 was the solution to

11  the perceived problems presented by the cryptocurrency mining industry.  *See* ECF

12  No. 32-1 at 457.  The Commissioners used their power to establish rates and charges

13  for electric energy supplied by the District to address a perceived problem.  Wash.

14  Rev. Code § 54.24.080(1).  Therefore, the Court finds that Blocktree is not likely to

15  succeed in proving that the District acted beyond its statutory authority in adopting

16  RS-17 and classifying cryptocurrency mining as an evolving industry.

17      Regarding the second prong of the *Barry* test, Blocktree argues that no

18  procedural safeguards prevented the District staff from arbitrarily classifying

19  cryptocurrency mining as an "evolving industry" under RS-17.  ECF No. 25 at 24–

20  25.  Washington courts have upheld ratemaking procedures that contain sufficient

21  safeguards protecting those that the new rate might affect, including statutory

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 14

1   directives setting standards for the rates or regulating utility financing; judicial

2   review of rates that could be discriminatory or unreasonable; and the right to public

3   comment.  *See King Cty. Water Dist. No. 54 v. King Cty. Boundary Review Bd.*, 554

4   P.2d 1060, 1066–67 (Wash. 1976).  If the delegating statute provides no procedural

5   safeguards, procedural safeguards may be provided by the administrative body

6   instead.  *Earle M. Jorgensen Co.*, 665 P.2d at 1333.

7        The only standard that Washington's electricity ratemaking laws provide is

8   that electricity rates must be fair and nondiscriminatory; they impose no procedural

9   requirements.  *See* Wash. Rev. Code § 54.24.080(1).  Nonetheless, Blocktree was

10  provided several procedural safeguards, preventing their classification as an

11  evolving industry from being arbitrary.  First, judicial review of the rates is available

12  as evidenced by this ongoing lawsuit.  Second, Blocktree participated in the public

13  comment sessions during the development of RS-17.  ECF No. 37-6 at 60–73 (first

14  public presentation on April 24, 2018); 77–88 (second public presentation on June

15  26, 2018); 99–106 (Cryptocurrency miners' written comments from July and August

16  of 2018).

17       While Blocktree may disagree with the outcome of these procedures, their

18  disagreement does not make the District's decision to classify cryptocurrency

19  mining as an evolving industry an arbitrary decision.  The procedural safeguards

20  here are adequate and prevent arbitrary action by the District.  *King Cty.*, 554 P.2d at

21  1066–67.  Therefore, Blocktree's challenge under the second prong of the *Barry* test

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 15

1  is not likely to succeed on the merits.

2      Blocktree's second argument on why they are likely to succeed on the merits

3  of their Washington utility law claim is that RS-17 is discriminatory because it treats

4  cryptocurrency miners differently from customers with similar service requirements

5  and risk factors, such as large data centers, polysilicon manufacturers, or agricultural

6  businesses.  ECF No. 25 at 25.  The District argues that Blocktree fails to recognize

7  the unique features of the cryptocurrency industry that differentiates miners from

8  other customers.  ECF No. 37 at 24.

9      Any analysis of utility rates under Washington law starts with the presumption

10  that the rates are reasonable, and courts will only overturn the rates if they are

11  excessive and disproportionate to the services rendered or arbitrary and capricious.

12  *Lincoln Shiloh Assocs., Ltd. v. Mukilteo Water Dist.*, 724 P.2d 1083, 1087 (Wash.

13  Ct. App. 1986).  Those challenging the rates must prove that the rates are

14  unreasonable.  *Id.*

15      Blocktree submits, through an expert witness, that "[b]ased on actual

16  consumption characteristics, the segregation of Evolving Industry customers into a

17  separate rate class is not well justified."  ECF No. 26 at 13.  Mr. Kemp identifies

18  other industries, such as data centers, polysilicon manufacturers, and agribusinesses,

19  that display similar regulatory, business, and consumption risks that would justify

20  classifying them as "evolving industries."  *Id.* at 18.  According to Blocktree, the

21  District's failure to classify these other industries as evolving industries proves that

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 16

1    RS-17 is discriminatory.  ECF No. 25 at 25.

2         Blocktree fails to recognize one of the main aspects of the District's

3    justification for classifying cryptocurrency mining as an evolving industry: the

4    sudden influx of interest from cryptocurrency mining companies in the District's

5    area of service.  According to the District, since the summer of 2017, they have

6    received 125 requests for service totaling 2,000 MW of new load, 75% of the new

7    load being from cryptocurrency mining operations.  ECF Nos. 32-1 at 457; 37-6 at

8    7–8.  Further, the District states that they received actual applications from

9    cryptocurrency miners requesting 313 MWs of power since the summer of 2017.

10   ECF No. 32-1 at 549.

11        The District identified the unique traits of the cryptocurrency mining industry

12   that distinguishes the industry from others, including that its operations require few

13   natural resources and employees, making their operations easy to transfer from one

14   location to another.  ECF No. 32-1 at 458.  Blocktree disputes the mobility of its

15   industry, arguing that they have made significant investments in Grant County that

16   are not mobile.  ECF Nos. 41 at 13; 44 at 3–4; 45–49.  The District also argued that

17   the volatility of cryptocurrency prices exposes the District to the risk of unpaid

18   power bills by Blocktree and other cryptocurrency mining operations.  ECF No. 32-1

19   at 659.  Further, the District has stated that RS-17 also will apply to future industries

20   that present the same traits as cryptocurrency mining.  ECF No. 37-6 at 19–20.

21        Blocktree's arguments can be summarized as picking and choosing traits from

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 17

1    different industries and combining them together, resulting in  the District's

2    discrimination against them.  *See* ECF No. 26 at 13–18 (Mr. Kemp's conclusions);

3    ECF No. 42 at 61 (price volatility chart of polysilicon).  However, the Court finds

4    that combining the traits from several different industries together does not show, at

5    this point in the litigation, a likelihood that the District intentionally discriminated

6    against Blocktree or that their decision to classify cryptocurrency mining as an

7    evolving industry was made in the absence of evidence.  Blocktree ignores the main

8    reason motivating the District's classification decision: the sudden influx of interest

9    from cryptocurrency miners in the District's power services.  ECF No. 32-1 at 457.

10   The cryptocurrency industry's sudden interest in Grant County and the unique traits

11   of the industry, all of which were considered by the District in creating and

12   implementing RS-17, show that Blocktree has failed to overcome the presumptive

13   reasonableness of RS-17.  *See Lincoln Shiloh*, 724 P.2d at 1087. The Court finds that

14   Blocktree is not likely to succeed on their second utility rate statutory argument.

15        Blocktree's third argument under Washington's ratemaking laws is that the

16   District did not rely on "scientific statistical analysis" to create RS-17, and instead

17   relied on subjective determinations.  ECF No. 25 at 26.  Blocktree argues that rates

18   must be established with "scientific statistical analysis" based on *Lincoln Shiloh*, 724

19   P.2d at 1087.  In that case, the Washington Court of Appeals held that a utility fee

20   was reasonable in part because it was generated with "scientific statistical analysis."

21   *Id.*  However, the court did not hold that "[d]ifferent rates can be charged to different

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 18

1   customer classes only if 'scientific statistical analysis' shows substantial differences

2   in the costs of serving those different customer groups," as Blocktree argues here.

3   ECF No. 25 at 23.  While scientific statistical analysis could be one way to show that

4   the charged rates are reasonable, *Lincoln Shiloh* does not state that a utility district is

5   required to use scientific statistical analysis to prove the reasonableness of charged

6   rates.  *Lincoln Shiloh*, 724 P.2d at 1087.  This argument also implies that the burden

7   is on the District to prove that its rate is reasonable by showing that the rate is based

8   on scientific statistical analysis.  However, as *Lincoln Shiloh* holds, the burden falls

9   on Blocktree to prove that they are likely to succeed in proving that the rate is

10  unreasonable.  See *Lincoln Shiloh*, 724 P.2d at 1087.  Therefore, the Court finds that

11  Blocktree's third argument as to why RS-17 violates Washington rate-setting laws is

12  not likely to succeed on the merits.

13          Blocktree's fourth argument is that RS-17 is not cost-based.  ECF No. 25 at

14  26.  According to Blocktree, because RS-17 is not cost-based, the rate is

15  unreasonable because it charges costs that are "excessive and disproportionate to the

16  services rendered."  *Id.*; *Teter v. Clark Cty.*, 704 P.2d 1171, 1179 (Wash. 1985).  The

17  District argues that the costs imposed on RS-17 customers offset the additional costs

18  that would be incurred by the cryptocurrency industry's power demands on the

19  District.  ECF No. 37 at 23.

20          The concept of ratemaking is discriminatory by design, as the process

21  involves classifying customers into different groups and charging those groups

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 19

1    different prices based on the characteristics of the customers in each group.

2    Nonetheless, Washington law requires the rates and charges for electrical services to

3    be fair and nondiscriminatory. Wash. Rev. Code § 54.24.080(1). Recognizing this

4    dichotomy, Washington courts have held that "[d]ifferent classes of customers may

5    be charged different rates as long as the classifications themselves are reasonable."

6    *Hillis Homes, Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 714 P.2d 1163, 1170

7    (Wash. 1986). "Absolute uniformity in rates is not required." *Teter*, 704 P.2d at

8    1179. If the utility district can show "how and why the rate was devised," then the

9    rate is considered reasonable, nondiscriminatory, and not arbitrary. *Id.* at 1180.

10    Further, if the increase in the charges for one group pays for improvements

11    necessitated by that new group, the rates are not discriminatory. *Lincoln Shiloh*, 724

12    P.2d at 1087. "[O]nly a *practical* basis for the rates is required, not mathematical

13    precision." *Teter*, 704 P.2d at 1179 (emphasis in original).

14    Blocktree argues that customers served under RS-17 in the District pay 31%

15    above the cost of providing electricity to the RS-17 customers, whereas residential

16    customers pay 30% below their cost of service, which works as a "transfer of wealth

17    from Plaintiffs to Grant's favored 'traditional' customers." ECF No. 25 at 26; ECF

18    No. 26 at 21. According to Blocktree, the 31% premium can be attributed to an

19    "adder," or an additional charge for a specific purpose, to pay for an upgraded

20    transmission system by 2021, an extra charge for the extra wear on the District's

21    distribution systems caused by cryptocurrency miners, and an extra charge to protect

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 20

1    the District from abandoned facilities if the cryptocurrency miners cease operations.

2    ECF No. 25 at 27–28.

3         The District argues that RS-17 is based on both direct and indirect costs to the

4    District in servicing cryptocurrency miners.  ECF No. 37 at 25.  In calculating the

5    rates charged under RS-17, the District assumed 200 MW of new load from

6    cryptocurrency miners, which is far less than the potential load of the interested

7    miners (1,500 MW) or miners that had actually applied for services from the District

8    (313 MW).  ECF Nos. 32-1 at 549; 37-6 at 16.  The District then calculated RS-17's

9    rate based on the effects estimated from 200 MW of new load, including: a need to

10   upgrade transmission systems by 2021 instead of 2026; projected wear on the

11   distribution system from the new customers; and the risks involved in losing a

12   cryptocurrency mining customer without warning.  ECF No. 37-2 at 5.

13        While Blocktree disagrees with the method with which RS-17 was calculated,

14   the District has provided justifications for every element of RS-17.  The District

15   argues that the transmission adder is necessary because the current load of

16   cryptocurrency customers, along with the projected new 200 MW of load, will

17   require an equipment upgrade quicker than the previously-planned upgrade in 2026.

18   ECF Nos. 37-2 at 7; 37-4 at 7; 37-5 at 14–15.  Further, customers charged under RS-

19   17 are only paying a portion of the costs for the new equipment and are not

20   subsidizing the new equipment for the benefit of the entire district.  ECF No. 37-5 at

21   7.  While it is true that cryptocurrency miners' current electricity load has not caused

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 21

1   wear on the District's equipment yet, RS-17 was calculated based on the costs

2   associated with the projected wear from an increased 200 MW of load from

3   cryptocurrency miners, including additional equipment and crew.  ECF No. 32-1 at

4   518 (excerpt from public presentation explaining that a portion of RS-17 payments

5   "[a]llocates additional equipment and crew time to deal with overheating and

6   additional wear.") and 602 ("Have not experienced residential equipment failure due

7   to cryptocurrency mining.").  Additionally, the District states that the upgrades

8   would not be needed if they did not receive a large amount of interest from the

9   cryptocurrency mining field, necessitating the extra charge that protects the rest of

10  the District's customers from paying for upgrades that they do not need.  ECF Nos.

11  37-2 at 8–9; *Lincoln Shiloh*, 724 P.2d at 1087 ("If [additional] charges pay only for

12  those improvements necessitated by new customers they are not discriminatory.").

13  While Blocktree may argue that calculating a utility rate based on projected costs is

14  unsound ratemaking, Blocktree has not pointed to any case law or statute that

15  prevents this practice.  ECF No. 26 at 26.

16      The District's calculations all condense into one simple justification: but for

17  the increased interest from cryptocurrency miners in the District, the future upgrades

18  and protection against abandoned facilities would not be necessary.  Based on the

19  evidence provided to the Court, the Court cannot conclude at this time that Blocktree

20  is likely to succeed in showing that RS-17 is "excessive and disproportionate to the

21  services rendered."  *Teter*, 704 P.2d at 1179.  Blocktree has not overcome the

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 22

1    presumption of reasonableness given to utility rates in Washington, and the District

2    has offered ample evidence of how and why the rates were devised.  *Id.*

3    Accordingly, the Court finds that Blocktree has not shown that it is likely to succeed

4    on their cost-based arguments under Washington's utility laws.

5         Blocktree's fifth argument is that RS-17 improperly ascribes costs to

6    cryptocurrency miners.  ECF No. 25 at 28.  Specifically, Blocktree argues that they

7    are not responsible for the increased costs driving RS-17's creation because they

8    have been the District's customers long before the sudden influx in cryptocurrency

9    mining companies requesting access to the District's power.  *Id.*  The District

10   considered "grandfathering" Blocktree into its electricity rates under RS-7 and

11   imposing RS-17 only on new cryptocurrency mining companies but concluded that

12   the grandfathering would be "legally untenable."  ECF No. 32-1 at 537.

13        The District's initial conclusion that grandfathering Blocktree into RS-7

14   would be "legally untenable" has merit.  "The rates for each class must be internally

15   uniform, but different classes may be charged different rates."  *Teter*, 704 P.2d at

16   1179.  "In considering the validity of [a utility rate], we must first consider the

17   question of whether there is a proper classification of customers and areas.  The test

18   is whether the city had a reasonable basis for the classification and whether the

19   customers within the class are treated equally."  *Silver Shores* 555 P.2d at 996.  If

20   the District excluded Blocktree and other Grant County cryptocurrency miners from

21   the emerging industries class subject to RS-17's rates, but subjected new

1  cryptocurrency mining companies to RS-17, the District likely would violate the

2  requirement that customers within each rate class be treated equally.  *See Teter*, 704

3  P.2d at 1179.  Additionally, as will be discussed further in this opinion, the District

4  could have subjected itself to potential liability under Washington's Privileges and

5  Immunities Clause if the District gave preferential treatment to Blocktree over new

6  mining companies.  Blocktree essentially argues that the District's alleged

7  discrimination against Blocktree would be cured if the District placed Blocktree on

8  the side benefited by the alleged discrimination.  The Court finds that Blocktree's

9  fifth argument is not likely to succeed on the merits.

10      Blocktree's sixth and final argument under Washington utility laws is that RS-

11  17 is arbitrary because it violates "well-accepted utility ratemaking principles of

12  gradualism, avoidance of rate shock, and predictability."  ECF No. 25 at 28.  They

13  argue that the District is required to follow these principles because of the District's

14  Resolution No. 8768, passed in May of 2015, which states that the District's rate

15  schedules should follow these principles.  *Id.*; ECF No. 32-1 at 616.

16      In support of their sixth argument, Blocktree relies on a case from Division II

17  of the Washington Court of Appeals that held that the Pierce County Council acted

18  arbitrarily and capriciously because it "did not follow its own procedures and did not

19  disagree with any findings [from the proceedings below]."  *J.L. Storedahl & Sons,*

20  *Inc. v. Clark Cty.*, 180 P.3d 848, 854 (Wash. Ct. App. 2008).  But that case turned on

21  a county council's application of the county code as opposed to a Resolution that

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 24

1    was subject to change at any time by a vote of the commissioners.  *Id.*  Further, the

2    District argues that the principles of gradualism, rate shock avoidance, and

3    predictability only apply when a customer's rates are adjusted within the same class,

4    rather than when a customer is moved from one class to another, as in this case.

5    ECF No. 37-5 at 6.

6        While the Resolution does state that the District should avoid rate shock when

7    it adjusts its rates, the Resolution only decrees that the District should "limit impact

8    to customers."  ECF No. 32-1 at 616.  Blocktree's rates will rise as a result of RS-

9    17's implementation, but Blocktree cannot show at this time that the District did not

10   attempt to "limit impact to customers" when it calculated and approved RS-17.

11   Therefore, Blocktree has not shown a likelihood of  success on the merits of this

12   sixth argument.

13       Based on the Court's review of the evidence, Blocktree has not made a "clear

14   showing" that they are likely to succeed on the merits of their Washington utility law

15   claim.  *Winter*, 555 U.S. at 20; *Mazurek*, 520 U.S. at 972.  Blocktree is not likely to

16   overcome the presumptive reasonableness of RS-17.  Therefore, Blocktree has failed

17   to show that it is likely to succeed in proving that the District acted arbitrarily or

18   capriciously or discriminated against them and other cryptocurrency miners by

19   implementing RS-17.  The Court concludes that Blocktree is not likely to succeed on

20   the merits of its Washington utility laws claim.

21

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 25

1

***Federal Power Act***

2      Blocktree argues that the District also violated the Federal Power Act, 16

3  U.S.C. § 813, because RS-17 is unreasonable and discriminatory.  ECF No. 25 at

4  23–24.  The District argues that the Federal Power Act does not apply to them.  ECF

5  No. 37 at 26.

6      The Federal Power Act provides that the "rates charged and the service

7  rendered" for power provided by municipalities subject to the Federal Power Act's

8  jurisdiction "shall be reasonable, nondiscriminatory, and just to the customer and all

9  unreasonable discriminatory and unjust rates or services are prohibited and declared

10  to be unlawful."  16 U.S.C. § 813.  However, the Federal Energy Regulatory

11  Commission previously concluded that "Sections 19 and 20 [of the Federal Power

12  Act] do not apply to [the District]" because Washington expressly granted Grant

13  County self-regulatory authority over electricity ratemaking.  *The Yakima Nation v.*

14  *Pub. Util. Dist. No. 2 of Grant Cty., Wash.*, 101 FERC 61793, 61796 (F.E.R.C.

15  2002).  The nondiscrimination provision of the Federal Power Act, 16 U.S.C. § 813,

16  is a part of Section 20, so it does not apply to the District.  16 U.S.C. § 813.

17      Even if section 813 applied to the District, the Court finds that the

18  discrimination analysis under the Federal Power Act is not substantially different

19  from the discrimination analysis under Washington's utility rate laws.  Therefore,

20  the Court finds that Blocktree is not likely to succeed on the merits of its Federal

21  Power Act claim for the reasons stated in the above section.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 26

1        ***Due Process***

2        The parties dispute whether Blocktree is likely to succeed on the merits of its

3  due process claims under both the United States and Washington Constitutions.

4  ECF No. 25 at 29; ECF No. 37 at 26.

5              ***Federal Due Process***

6        The Fourteenth Amendment to the United States Constitution prohibits the

7  deprivation of "life, liberty, or property without due process of law."  U.S. Const.

8  amend. XIV § 1.  To succeed on a federal procedural due process claim, a party must

9  prove two elements.  First, a person must show that he or she was deprived of a

10  protected liberty or property interest.  *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1073

11  (9th Cir. 2015).  Second, the person must prove that the deprivation of the protected

12  interest was caused by a denial of adequate procedural protections.  *Id.*

13        Before due process rights attach, a person must show that the deprivation

14  occurred as a result of an adjudicatory process rather than a legislative process.  *See*

15  *Harris v. Cty. of Riverside*, 904 F.3d 497, 501 (9th Cir. 1990).  If the matter is one in

16  which "all are equally concerned," the matter is a legislative process and due process

17  rights do not attach.  *Bi-Metallic Inv. Co. v. State Bd. Of Equalization*, 239 U.S. 441,

18  445 (1915).  If the matter is one in which a "relatively small number of persons [are]

19  concerned, who [are] exceptionally affected, in each case upon individual grounds,"

20  then the process is adjudicatory and due process rights attach.  *Id.* at 446; *see also*

21  *Londoner v. City & Cty. of Denver*, 210 U.S. 373, 385–86 (1908) (holding that a

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 27

1   small number of people who were disproportionately affected by a tax were entitled

2   to a hearing before that tax was enacted).

3        The parties dispute whether the process by which RS-17 was enacted was

4   legislative or adjudicatory under federal due process standards.  ECF No. 25 at 32;

5   ECF No. 37 at 27.  Blocktree argues that the process was adjudicatory.  ECF No. 25

6   at 32.  When RS-17 is implemented on April 1, a select number of the District's

7   customers will be affected by the heightened rate, and the District weighed three

8   subjective factors to determine whether cryptocurrency mining was an evolving

9   industry.  However, the District argues that the process was legislative.  ECF No. 37

10  at 28.  RS-17 affects the entire cryptocurrency industry, not just Blocktree, and RS-

11  17 potentially will affect other new and unproven industries in the future.  The Court

12  finds that the disposition of this motion does not turn on this difficult determination,

13  so the Court assumes *arguendo* that cryptocurrency mining's classification as an

14  evolving industry was adjudicatory.

15       Blocktree claims that it has two protected property interests that are deprived

16  by the District's decision to implement RS-17.  ECF No. 25 at 29.  First, they argue

17  that their "tens of millions of dollars" that they have invested in their mining

18  operations in Grant County will be rendered useless by RS-17's "crippling rates."

19  *Id.* at 29–30.  Second, they argue that they have a protected interest in their current

20  power rate.  *Id.* at 30.

21       "[T]he range of interests protected by procedural due process is not infinite."

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 28

1   *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972).  Accordingly, to

2   have a property interest in something, a person "must have more than an abstract

3   need or desire for it.  He must have more than a unilateral expectation of it.  He

4   must, instead, have a legitimate claim of entitlement to it."  *Id.* at 577.  Property

5   interests are created by "existing rules or understandings that stem from an

6   independent source such as state law."  *Id.*

7       Blocktree claims that it has existing property rights in its investments in Grant

8   County.  However, their investments were not created by "existing rules or

9   understandings that stem from an independent source such as state law."  *Roth*, 408

10   U.S. at 577.  Rather, the investments were the result of Blocktree's own decision

11   making.  Plaintiffs' theory would require that any time a government entity causes a

12   person's investment to become less valuable, that person would be entitled to notice

13   and an opportunity for a hearing before the devaluation occurs.  This would

14   essentially make anything of monetary value a property interest protected by the due

15   process clause, a conclusion foreclosed by Supreme Court precedent.  *Id.*  The Court

16   finds that Blocktree is not likely to succeed in proving that it has a protected

17   property interest arising from its investments alone.

18       Blocktree additionally argues that it has a protected property interest in its

19   existing utility rate, RS-7.  ECF No. 41 at 16.  At oral argument, counsel for

20   Blocktree pointed the Court to a case from the Mississippi Supreme Court that holds

21   that a person has a right to notice and a hearing when the person is subjected to a

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 29

1  "confiscatory" utility rate.  In that case, the Mississippi Supreme Court held that the

2  Mississippi Power Company violated Mississippi law by failing to give proper

3  notice of the rate increase to the ratepayers.  *Miss. Power Co., Inc. v. Miss. Pub.*

4  *Serv. Comm'n*, 168 So. 3d 905, 913–15 (Miss. 2015).  However, the Mississippi

5  Supreme Court decided the issue in that case without an analysis of whether a

6  certain utility rate is a property interest protected by the Due Process Clause.  *See id.*

7  at 913.  In fact, that Court held that "ratepayers have no property interest in a *certain*

8  *rate*." *Id.* (emphasis in original).[2]  The United States Supreme Court case on which

9  the Mississippi Supreme Court relied, *Memphis Light, Gas & Water Div. v. Craft*,

10  held that a ratepayer has a due process right to present objections to utility bills

11  before the cancelation of services, not that a ratepayer has a property interest in a

12  particular utility rate.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1

13  (1978).  Neither the Mississippi Supreme Court case, nor the authority on which the

14  Mississippi Supreme Court relied, holds that a ratepayer has a protected property

15  interest in a certain utility rate.

16      The Court declines to analyze whether RS-17 is a "confiscatory" rate, because

17  even if it was, there has been no citation to Washington State or Federal case law

18  holding that Blocktree would have a protected property interest in any non-

19  _____

20  [2] Further, the Mississippi Supreme Court relied heavily on procedural requirements
in Mississippi utility laws to conclude that the Mississippi Power Company denied
ratepayers due process.  *See Miss. Power Co.*, 168 So. 3d at 914 n.13 (citing Miss.
21  Code Ann. §§ 77–3–13(3), 77 –3–37(1) and (9)).

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 30

confiscatory rate. Without an "independent source" protecting Blocktree's' rates charged under RS-7, the Court finds that Blocktree is not likely to succeed in proving that the District deprived them of a protected property interest by charging it under RS-17.[3] *Roth*, 408 U.S. at 577.

### Washington Due Process

The Washington State Constitution prohibits any deprivation of "life, liberty, or property, without due process of law." Wash. Const. Art. I § 3. Similar to a federal due process claim, a party must first show that the process through which its alleged right was deprived was adjudicatory rather than legislative, as due process rights attach to the former but not the latter. *Earle M. Jorgensen Co.*, 665 P.2d at 1330–31. The Washington Supreme Court has "consistently held [that] rate setting is a legislative act, even with respect to rate allocation and design." *Id.* at 1332. Because ratemaking is legislative, there is no right to notice or an opportunity to comment. *Id.* "In reviewing ratemaking decisions of legislative bodies, we have looked only to whether the rates were fair (*i.e.*, reasonable, nondiscriminatory, not arbitrary or capricious)." *Id.* Because the Court already has found that Blocktree is not likely to succeed on the merits of its discriminatory and arbitrary rates claim,

---

[3] Blocktree also argues that they were denied due process because they were denied an opportunity to be heard regarding whether they should be included in the "Evolving Industries" class. There may be merit to Blocktree's argument about being classified without being heard. However, at this point in the litigation, the Court finds that such an issue would not be dispositive.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 31

1    Blocktree is not likely to succeed on the merits of its Washington due process claim.

2              ***Privileges and Immunities Clause of the Washington Constitution***

3              The parties dispute whether Blocktree is likely to succeed on the merits of

4    their Washington State privileges and immunities challenge to RS-17.  ECF No. 25

5    at 33; ECF No. 37 at 29.

6              In Washington, "[n]o law shall be passed granting to any citizen, class of

7    citizens, or corporation other than municipal, privileges or immunities which upon

8    the same terms shall not equally belong to all citizens, or corporations."  Wash.

9    Const. Art. I § 12.  The Supreme Court of Washington has construed article I section

10   12 as "substantially similar" to the federal equal protection clause, but at certain

11   times it "differed from and was more protective than the federal equal protection

12   clause and required a very different analysis."  *Schroeder v. Weighall*, 316 P.3d 482,

13   485 (Wash. 2014).  For example, Washington's privileges and immunities clause

14   prohibits so-called special interest legislation, which are laws that confer a benefit to

15   a privileged or influential minority.  *Grant Cty. Fire Prot. Dist. No. 5 v City of*

16   *Moses Lake*, 42 P.3d 394, 408 (Wash. 2002), *overruled on other grounds*.

17             Washington courts use a two-part test to determine whether a legislative act

18   violates Washington's privileges and immunities clause.  First, the court determines

19   whether the law in question involves a privilege or immunity.  *Ass'n of Wash. Spirits*

20   *& Wine Distribs. v. Wash. State Liquor Control Bd.*, 340 P.3d 849, 857–58 (Wash.

21   2015).  Second, the court determines whether the legislative body had a "reasonable

ground" for granting the privilege or immunity.  *Id.*

Blocktree claims that RS-17 implicates two privileges: the right to carry on a business and the right to nondiscriminatory utility rates.  ECF No. 25 at 33–34.  Further, Blocktree argues that there are no reasonable grounds justifying the District's differentiation between Blocktree and other similarly situated "politically favored" customers.  *Id.* at 34.

The privileges and immunities clause applies to "fundamental rights which belong to the citizens of the state by reason of such citizenship."  *State v. Vance*, 70 P. 34, 41 (Wash. 1902).  One long-recognized fundamental right in Washington is the right to carry on a business.  *Id.*  As it relates to the right to carry on a business, a privilege is "an exception from a regulatory law that benefits certain businesses at the expense of others."  *Ass'n of Wash. Spirits & Wine Distribs.*, 340 P.3d at 858.  For example, the Washington Supreme Court struck down a municipal ordinance that required non-resident photographers to pay substantial licensing fees and prohibited photography solicitation, while exempting resident photographers from the licensing fees.  *Ralph v. City of Wenatchee*, 209 P.2d 270, 272–74 (Wash. 1949).

But Washington courts have been hesitant to broadly apply the right to carry on a business in any legislative act that happens to harm a single aspect of a business.  In one instance, the Washington Supreme Court held that a prohibition on smoking in a place of employment did not violate the right to carry on a business.  *Am. Legion Post #149 v. Wash. State Dep't of Health*, 192 P.3d 306, 325–26 (Wash.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 33

2008). In another, the Washington Supreme Court held that a licensing fee scheme for vendors of liquor and spirits did not implicate the right to carry on a business. *Ass'n of Wash. Spirits & Wine Distribs.*, 340 P.3d at 859. The key inquiry for determining whether the right to carry on a business is implicated by an act is whether the act "unfairly discriminate[s] against a class of businesses to the benefit of another class of the same businesses." *Id.* at 859.

Blocktree argues that the evolving industry classification and RS-17's rates will reduce the profits of running a cryptocurrency mining operation in the District. However, as *Am. Legion* and *Spirits & Wine* both show, mere harm to a business's profits caused by a change in the laws does not implicate the right to carry on a business. *Am. Legion*, 192 P.3d at 326; *Ass'n of Wash. Spirits & Wine Distribs.*, 340 P.3d at 859. A violation of the right to carry on a business is only implicated by government actions that "unfairly discriminate against a class of businesses to the benefit of another class of the *same businesses*," such as what happened in *Ralph*, when city ordinances discriminated against non-city-resident photographers to the benefit of resident photographers.[4] *Ass'n of Wash. Spirits & Wine Distribs.*, 340

---

[4] As mentioned earlier, this line of cases explains why Blocktree's contention that it should have been "grandfathered in" to RS-7's rates is "legally untenable." Subjecting one class of cryptocurrency miners to the rates charged under RS-7 while subjecting another class of cryptocurrency miners to the rates charged under RS-17, based solely on when those miners established operations in the District, arguably would discriminate unfairly within the class of the same business.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 34

1    P.3d at 859 (emphasis added); *Ralph*, 209 P.2d at 272–74.  Blocktree's right to carry

2    on a business allegations are more like the allegations in *Spirits & Wine* or *Am.*

3    *Legion* rather than *Ralph*, because Blocktree essentially alleges that the District

4    violated its right to carry on a business of its choosing, rather than alleging

5    discrimination against a class of businesses to the benefit of another class of the

6    same business.  The Court finds that Blocktree has not shown a likelihood of success

7    of proving a violation of the right to carry on a business.

8         The other fundamental right that Blocktree claims RS-17 violates is the

9    fundamental right to nondiscriminatory utility rates.  ECF No. 25 at 33–34.

10   However, no Washington court has found that such a fundamental right exists.  *See*

11   *Faxe v. City of Grandview*, 294 P.2d 402, 495 (Wash. 1956) ("We will therefore

12   assume, without deciding, that such a duty exists by virtue of Art. I, § 12, of the state

13   constitution."); *Geneva Water Corp. v. City of Bellingham*, 532 P.2d 1156, 1160

14   (Wash. Ct. App. 1975) (quoting the same passage from *Faxe*).  Even if there is a

15   fundamental right to a nondiscriminatory utility rate protected by the privileges and

16   immunities clause, the Court already concluded that Blocktree is not likely to

17   succeed in proving that RS-17 is unlawfully discriminatory.  Therefore, the Court

18   finds that Blocktree is not likely to succeed on the merits of their privileges and

19   immunities claim.

20        Even if Blocktree is successful in showing a violated fundamental right, it still

21   would need to prove the second element of a privileges and immunities claim, which

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 35

1    is that a reasonable ground does not exist to grant the privilege or immunity. *Ass'n*

2    *of Wash. Spirits & Wine Distribs.*, 340 P.3d at 857–58.  Under the reasonable ground

3    test, "the court will scrutinize the legislative distinction to determine whether it *in*

4    *fact* serves the legislature's stated goal." *Schroeder*, 316 P.3d at 486 (emphasis in

5    original).  This standard is more exacting than rational basis review.  *Id.*

6    　　　As explained above, the District faced legitimate concerns over the amount of

7    interest that cryptocurrency mining companies expressed in the District's low power

8    costs.  Considering these concerns, the District developed the evolving industry

9    classification and RS-17 to ensure that the electricity needs of all of its customers

10    would be fulfilled.  Specifically, RS-17 helps the District manage the high level of

11    interest from the cryptocurrency field and prepare its infrastructure for any sudden

12    influx of new cryptocurrency businesses.  There is significant evidence that The

13    District did not implement RS-17 "in an arbitrary selection," as Blocktree claims.

14    The District developed and implemented RS-17 over a long period of time from the

15    summer of 2017 until its approval on August 28, 2018,  with several opportunities

16    for public comment and input.  *State ex rel. Bacich v. Huse*, 59 P.2d 1101, 1105

17    (Wash. 1936), *overruled on other grounds*.  Therefore, even if Blocktree can prove a

18    violation of a fundamental right, the Court finds that Blocktree is not likely to

19    succeed on proving the second element of a privileges and immunities claim.

20    　　　The Court finds that Blocktree is not likely to succeed on the merits of any of

21    its claims presented in its motion for preliminary injunction.  Additionally, Blocktree

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 36

has not demonstrated serious questions on the merits of its claims.

***Irreparable Harm***

The parties dispute whether the implementation of RS-17 starting on April 1, 2019, will cause irreparable harm to Blocktree.  ECF No. 25 at 35; ECF No. 37 at 31.

A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of an injunction.  *Winter*, 555 U.S. at 20.  Monetary injury, alone, does not meet this standard.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  A legitimate threat that a company might become bankrupt or be driven out of business because of a plaintiff's action does show irreparable harm.  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).  A mere possibility of harm, however, will not meet this standard.  *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011).

Blocktree argues that the rate increases from RS-17 would render its operations "uneconomical" and force Blocktree to end its business in Grant County.  ECF Nos. 27–31, 36-1.  They state that they "might even be forced into bankruptcy" by such a rate increase.  *Id.*  Blocktree argues that RS-17's rate increases will increase their rates by anywhere between 295–400%; however, because RS-17 is being implemented over several years, Blocktree will not immediately feel the full

effects of RS-17's rate increases. *See* ECF Nos. 27–31, 36-1, 37-6 at 113. Even if the rate increase occurred all at once, a mere possibility of bankruptcy does not meet the irreparable harm standard. *Enyart*, 630 F.3d at 1165. Therefore, the Court finds that Blocktree has failed to show that it will suffer irreparable harm if RS-17 is implemented.

### Balance of Equities

The parties dispute whether the balance of equities weighs in Blocktree's favor. ECF No. 25 at 36; ECF No. 37 at 32.

Before granting an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotations and citations omitted).

Here, Blocktree argues that the balance of equities tips in its favor because RS-17 will impose burdens on Plaintiffs but preventing RS-17's effects will not harm the District. ECF No. 25 at 36. The District argues that enjoining RS-17 will hamper the District's ability to collect revenues for utility bills in their district. ECF No. 37 at 32. Because some harm will occur to Blocktree immediately, the Court finds that this factor favors Blocktree.

### Public Interest

The parties dispute whether an injunction would be in the public interest. ECF No. 25 at 37–38; ECF No. 37 at 33.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ~ 38

A plaintiff seeking a preliminary injunction must demonstrate that the public interest favors the injunction in light of the likely consequences. *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). When constitutional rights are implicated, the public has an interest in ending the violation of those rights. *Id.*

Blocktree argues that a preliminary injunction is in the public interest because it will remedy the District's constitutional and statutory violations. ECF No. 25 at 37–38. Further, Blocktree argues that, in absence of a preliminary injunction, they will have to relocate their operations and cease paying the District millions of dollars in revenue, which will trickle down to harm the District's other ratepayers. *Id.* The District argues that their actions underlying the claims in this case were taken in pursuit of the public interest by protecting the District's ability to provide service long-term, showing that the public interest favors their position. ECF No. 37 at 33.

While Blocktree might have to relocate their operations in response to RS-17's implementation, the Court finds that the balance of equities tips in the District's favor. The District, as a government entity, is serving the public by protecting the public's need for long-term power while addressing the immediate needs and concerns generated by the cryptocurrency's interest in Grant County. *See* ECF No. 32-1 at 387–403.

## CONCLUSION

The Court recognizes the uniqueness of the factual scenario presented by this case. The Court's research did not find a case similar to the case at hand, in which a

1   utility district implements a new rate schedule and rate classification through public

2   comment and participation, but then classifies a group of customers thereafter using

3   subjective factors.  However, the Court's task in deciding whether to issue a

4   preliminary injunction is to weigh the four *Winter* factors and determine whether

5   Blocktree is likely to succeed on the merits of its claims; whether Blocktree will

6   suffer irreparable harm absent an injunction; whether the equities tip in its favor; and

7   whether an injunction would be in the public interest, based on the case law and

8   standards currently available for the Court's consideration.  *Winter*, 555 U.S. at 20.

9         The Court finds that Blocktree has failed to make a clear showing that it is

10   likely to succeed on the merits of any of its claims.  In addition, the Court finds that

11   Blocktree has not shown that it will suffer an irreparable injury without the

12   imposition of a preliminary injunction.  Therefore, the Court denies Plaintiffs'

13   motion for preliminary injunction.

14         Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for

15   Preliminary Injunction, **ECF No. 25**, is **DENIED**.

16         **IT IS SO ORDERED**.  The District Court Clerk is directed to enter this

17   Order and provide copies to counsel.

18         **DATED** March 29, 2019.

19

20                          *s/ Rosanna Malouf Peterson*
                            ROSANNA MALOUF PETERSON
21                            United States District Judge

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION ~ 40