FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 12, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BLOCKTREE PROPERTIES, LLC, a Washington limited liability company; CYTLINE, LLC, a Delaware limited liability company; 509 MINE, LLC, a Washington limited liability company; MIM INVESTORS, LLC, a Washington limited liability company; MINERS UNITED, LLC, a Washington limited liability company; MARK VARGAS, an individual; WEHASH TECHNOLOGY, LLP, a Washington limited liability company, | NO: 2:18-CV-390-RMP

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

                    Plaintiffs,

        v.

PUBLIC UTILITY DISTRICT NO. 2
OF GRANT COUNTY
WASHINGTON, a Washington
municipal corporation; TERRY
BREWER, individually and in his
official capacity; BOB BERND,
individually and in his official capacity;
DALE WALKER, individually and in
his official capacity; TOM FLINT,
individually and in his official capacity;
LARRY SCHAAPMAN, individually
and in his official capacity; NELSON
COX, individually and in his official
capacity; JUDY WILSON, individually
and in her official capacity, and DOES
1-10, managers and employees of Grant
County PUD, individually and in their
official capacities,

                    Defendants.

BEFORE THE COURT are the parties' Cross Motions for Summary Judgment. The Court has considered the briefing, the relevant precedent, the record, and is fully informed.

## BACKGROUND

This case involves the cryptocurrency industry and the rates that cryptocurrency companies pay for electricity. Cryptocurrency is a digital currency that exists solely on the internet; it is unregulated and unmanaged by third parties, such as banks or governments. ECF No. 81 at 7–8. Cryptocurrency is made possible by a technology called blockchain. *Id*. Blockchain is the technology through which cryptocurrency transactions are verified and tracked across networks of computers, working as a digital ledger. *Id.* Blockchain, functioning as a ledger, records every transaction in which each particular crypto coin has been used. For blockchain to track cryptocurrency transactions, the transactions must be verified by independent blockchain participators. ECF No. 81 at 7–8. These blockchain participants, also known as cryptocurrency miners, verify cryptocurrency transactions, essentially by solving complicated mathematical problems. ECF No. 81 at 8–9. The first miner to solve the problem, verifying the transaction on the blockchain (ledger), is rewarded, often in cryptocurrency. *Id.* Miners rely on advanced and specialized computer hardware to successfully mine cryptocurrency. *Id.*

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 2

Because cryptocurrency mining is technologically complex and requires advanced equipment, one of a miner's biggest expenses is electricity. ECF No. 81 at 9; ECF No. 106-3 at 4. Cryptocurrency miners work to reduce their power bills by locating their operations in areas with inexpensive and reliable access to large amounts of electricity. ECF No. 106-3 at 4.

Grant County, Washington, has some of the lowest electric rates in the country. *Id*. Electric rates in Grant County are set by Public Utility District No. 2 ("the District"). *See id*. The District is established under Title 54 of the Revised Code of Washington and operates as a municipal corporation at the direction of elected Commissioners, who are assisted by hired staff. ECF No. 37 at 9. Pursuant to District Resolution 8768, district staff prepare electric rate schedule proposals. ECF No. 106-3 at 6. Then, the Commission decides whether to adopt the proposed rate schedules. *Id*.

Prior to 2017, the district had fifteen distinct rate schedules, each schedule pertaining to a different "customer class," or group of costumers with similar, relevant characteristics. *See id*. at 5. Common examples of "customer classes" include "residential" and "industrial" classes. *Id*. at 29. Ultimately, members of a particular customer class "tend to exhibit common characteristics—whether in terms of electricity usage or otherwise—such that they can be effectively grouped together for [the District's] cost allocation purposes." *Id*. The customer class that a person

falls into determines which rate schedule is applicable to her, thereby setting the rate that she will pay for electricity.

In the summer of 2017, the District claims that it experienced a large influx of requests for power service from cryptocurrency miners, who were attracted to the District's low electric rates. *Id*. at 6. The District purports that requests from cryptocurrency miners in 2017 totaled 1,500 MW of new load, which constituted more than twice the District's average load of 600 MW. ECF No. 37-6 at 7.

Plaintiffs dispute the "influx" of service requests from cryptocurrency miners, arguing that the District has inflated this number. *See* ECF No. 136 at 7. Plaintiffs claim that the District did not take appropriate measures to get a realistic estimate of cryptocurrency miners interested in Grant County. *See id*. Regardless of the actual number of cryptocurrency mining companies interested in Grant County, the District thought it necessary to put together a team of staff ("Staff") to analyze how the District could satisfy the new demand while simultaneously servicing existing customers. *Id*. at 7.

At the direction of the Commission, the Staff analyzed how to respond to the unprecedented number of new requests for service, primarily from cryptocurrency miners. *Id*. Eventually, the Staff recommended that a new rate schedule, "RS 17," and a corresponding new customer class, the "Evolving Industries" class, be created. To decide if an industry falls into the Evolving Industries class, and is thus subject to

RS 17 rates, the Staff recommended a test focused on certain risk factors presented

by the industry in question.  ECF No. 37-6 at 91.  These risks are:

> Regulatory Risk – Risk of detrimental changes to regulation with the potential to render the industry inviable within a foreseeable time horizon.

> Business Risk – Potential for cessation or significant reduction of service due to a concentration of business risk, in an evolving or unproven industry, in the value of the customer's primary output.

> Concentration Risk – Potential for significant load concentration with Grant PUD's service territory resulting in a meaningful aggregate impact and corresponding future risk to Grant's revenue stream. Evaluation would begin to occur when industry concentration of existing and service request queue customer loads exceeds 5% of Grant PUD's total load.

*Id.*

The District argues that these risks are significant for the purposes of rate

setting in part, because if an industry requiring a large percentage of the district's

power fails, numerous costs related to infrastructure or contracts with other power

companies will be passed on to the remaining customers in the District.  As

explained in one Staff memorandum: "When retail load increases, it increases Grant

PUD's obligation under [its] Power Sales Contract to purchase additional energy

permanently.  That increased commitment to purchase power . . . will remain if the

[Evolving Industries] customers leave Grant's power system resulting in surplus

power.  To the extent that the sale of this surplus results in a loss, these costs will be

borne by remaining Grant PUD's [sic] customers."  ECF No. 37-6 at 94.

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ~ 5

Additionally, the District reasoned that the expansion of Evolving Industries, which by definition requires a relatively large percentage of the District's power, likely will necessitate the development of additional infrastructure. *Id*. at 94. Thus, if an Evolving Industry relocated to another district, or failed, the remaining customers would be forced to bear the costs of infrastructure upgrades necessitated by that Evolving Industry. *Id*.

In addition to the creation of the Evolving Industry class and RS 17, the Staff recommended a "two-queue" approach, under which "traditional" customers are placed in one queue to have their service requests addressed, and those belonging to the Evolving Industries class, like cryptocurrency miners, are placed in a separate queue. ECF No. 37-6 at 13. In the two-queue approach, traditional customers are served before any Evolving Industries customers. *Id*. at 13–14.

After RS 17 and the two-queue approach were drafted, but before they were adopted by the District, members of the cryptocurrency industry were notified. *See* ECF No. 106-3 at 11. During October of 2017, District Staff held an in-person meeting and took questions. *Id*. Additionally, all Commission meetings are open to the public and have a public comment period, including those during which the Commission discussed RS 17 and the two-queue approach. *Id*. at 12. During the comment period held at every public meeting, any person is permitted to comment on the issues raised during the meeting. *Id*. Prior to each meeting, the District posts

an agenda, commission packets, and presentation materials on the District Website, so that members of the community can become informed about the upcoming meeting and prepare thoughtful comments.  *See id*. at 12.

Between October 24, 2017, and August 28, 2018, the Commission held eleven open meetings during which it discussed RS 17 and the two-queue approach.  *Id*. at 12–13.  Various cryptocurrency mining companies made public comments at many of these meetings.  *Id*. at 13–15.  At the end of the process, on August 24, 2018, the Commission adopted RS 17 and the two-queue approach in Resolution 8891.  *Id*. at 13.  Because the cryptocurrency mining industry falls within the newly created Evolving Industries class, cryptocurrency mining companies are subject to RS 17 and placed in the Evolving Industries queue.

On December 19, 2018, Plaintiffs filed a complaint in this Court, challenging the District's new rate schedule under federal and Washington state law.  ECF No. 1.  Plaintiffs in this case are cryptocurrency mining entities with operations in Grant County and one individual involved in cryptocurrency mining in Grant County.  *Id*. at 4–6.  Plaintiffs have  alleged nine causes of action against the District, premised on the U. S. and Washington State Constitutions, and federal and state laws.  Plaintiffs claim that the District has violated the Commerce Clause of the Federal Constitution and the Due Process Clause of the Fifth and Fourteenth Amendments.  ECF No. 81 at 37–39.  For the alleged constitutional violations, Plaintiffs bring

claims for damages and attorneys' fees under 42 U.S.C. §§ 1983 and 1988. *Id*. at 39.

Plaintiffs also argue that the District violated Section 20 of the Federal Power Act,

16 U.S.C. § 813, by creating an unfair and discriminatory rate schedule. *Id*. at 40.

Finally, Plaintiffs argue that the district violated Washington ratemaking law, the

Due Process Clause of the Washington State Constitution, and the Privileges and

Immunities Clause of the Washington State Constitution. *Id*. at 40–46.

On March 19, 2019, this Court denied Plaintiffs' motion for a preliminary

injunction and, on interlocutory appeal, the Ninth Circuit affirmed this Court's

decision in an unpublished opinion. ECF Nos. 52, 101; *Blocktree Properties, LLC v.

Pub. Util. Dist. No. 2 of Grant Cty. Wash.*, 783 Fed. Appx. 769 (9th Cir. 2019).

The District first moved for summary judgment on May 8, 2019. However,

the Court granted Plaintiffs' motion to defer summary judgment pursuant to Rule

56(d). ECF No. 89. The District renewed its Motion for Summary Judgment on

December 19, 2019, and Plaintiffs moved for summary judgment shortly thereafter.

ECF Nos. 106 and 108.

## LEGAL STANDARD

When parties file cross-motions for summary judgment, the Court considers

each motion on its own merits. *See Fair Housing Council of Riverside Cty., Inc. v.

Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may grant summary

judgment where "there is no genuine dispute as to any material fact" of a party's

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ~ 8

prima facie case, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists if sufficient evidence supports the claimed factual dispute, requiring "a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). A key purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 324.

The moving party bears the burden of showing the absence of a genuine issue of material fact, or in the alternative, the moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's prima facie case. *Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *See id.* at 324. The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3 (internal quotations omitted).

The Court will not infer evidence that does not exist in the record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). However, the Court will "view the evidence in the light most favorable" to the nonmoving party. *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1111 (9th Cir. 2016). "The evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

## FEDERAL DUE PROCESS CLAIMS

Plaintiffs have alleged both a substantive and a procedural due process claim under the U.S. Constitution against the District.  The Court considers each claim in turn.

### A.    Substantive Due Process

To succeed on a substantive due process claim, the plaintiff "must show as a threshold matter that a state actor deprived it of a constitutionally protected life, liberty or property interest."  *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008).  Not all property interests are protected by substantive due process.  *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (J. Powell, concurring).  The property interests protected by substantive due process are fewer than those protected by procedural due process.  *Id*.  This is because procedural due process protects property interests derived from state law, while substantive due process does not.  *Ewing*, 474 U.S. at 229 (J. Powell, concurring); *see also Santiago de Castro v. Morales Medina*, 943 F.2d 129, 130–31 (1st Cir. 1991) (explaining that the Supreme Court never has suggested "that the constitutional safeguards accorded under the substantive component of the Due Process Clause embrace all

state-created property interests entitled to procedural due process protection");

*Bailey v. City of Pinellas Park*, 147 Fed. Appx. 932, 934 (11th Cir. 2005) (finding that substantive due process protects fundamental rights under the federal constitution, whereas procedural due process protects state-created property interests); *South Fork Livestock P'ship v. United States*, 183 F. Supp. 3d 1111, 1119 (D. Nev. 2016) (same). "Substantive due process rights are created only by the Constitution." *Ewing*, 474 U.S. at 229 (J. Powell, concurring). Thus, Plaintiffs cannot rely on state law to argue that they have a protected property interest for the purposes of substantive due process. *See id*. Rather, they must focus their argument on whether the U.S. Constitution has been interpreted to provide the alleged protected interest. *See id*.

Because Plaintiffs' due process claim has morphed over the course of this litigation, it is difficult to determine exactly what the property interest at issue is. Plaintiffs have recharacterized their alleged property interest several times. For instance, in their Complaint, Plaintiffs alleged that RS 17 would deprive them "of their property by massively and unjustifiably increasing their electric rates, thereby destroying the millions of dollars of investments they have made in Grant County." ECF No. 1 at 39. Accordingly, the Complaint defines the property at issue as Plaintiffs' investment in their land and operations. Plaintiffs have not directed the Court to any cases suggesting that a person's or company's "investment" alone is a

property interest protected by substantive due process. As this Court already has explained in the course of this litigation, accepting Plaintiffs' argument would improperly "make anything of monetary value a property interest protected by the due process clause." *Blocktree Properties, LLC v. Pub. Util. Dist. No. 2 of Grant Cty. Wash.*, 380 F. Supp. 3d 1102, 1122 (E.D. Wash. 2019).

Plaintiffs also have defined their alleged property interest as the right to a fair, non-arbitrary utility rate. ECF No. 131 at 25. Again, the Court can find no cases, and Plaintiffs cite none, indicating that a consumer's interest in a non-arbitrary utility rate is a protected interest for the purposes of substantive due process.

Most recently, Plaintiffs have categorized their purported property interest as a right to be free of confiscatory rates that amount to the taking of property without due process of law. *See id*. at 26. The doctrine of "confiscatory rates" applies to utility companies. *See Mich. Bell Tele. Co. v. Engler*, 257 F.3d 587, 593 (quoting *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989) (citation omitted)). When a government forces a utility company to provide power at a rate that is too low, or confiscatory, that action is considered a taking because "the State has taken the use of utility property without paying just compensation." *Duquesne Light Co.*, 488 U.S. at 307–308. Accordingly, the due process clause protects utility companies from being forced to provide power at confiscatory rates. *Id*. Plaintiffs

in this case are not utility companies. Therefore, their due process argument regarding confiscatory rates lacks merit.

Because Plaintiffs have not identified a viable property interest protected by substantive due process, they cannot demonstrate that they have been deprived of such an interest without due process. Therefore, Plaintiffs' substantive due process claim fails as a matter of law.

### B. Procedural Due Process

In addition to their substantive due process claim, Plaintiffs have brought a procedural due process claim under the U.S. Constitution. Procedural due process claims have two elements: (1) a deprivation of a protected liberty or property interest, and (2) a "denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).

#### *Property Interest*

For the purposes of procedural due process, property interests are created by a source independent of the Constitution, like state law. *See Regents of Univ. of Mich. V. Ewing*, 474 U.S. 214, 229 (1985) (J. Powell, concurring); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (explaining that property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source," like state law). These property interests "include anything to which a plaintiff has a 'legitimate claim of entitlement.'"

*Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1191 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77 (1972)).

To have a legitimate claim of entitlement to a benefit, a plaintiff "must have more than a unilateral expectation of it." *Id*. at 577. To create an entitlement to a benefit, an independent source, such as state law, must establish and define the contours of that benefit. *Id*. When state law describes the nature of the benefit, who is entitled to receive it, and under what circumstances they are entitled to receive it, a qualified plaintiff is more likely to have a legitimate claim of entitlement to that benefit. *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970). Similarly, when the law "contains mandatory language that restricts the discretion" of the body administering the benefit, it is more likely that the benefit is a protected property interest. *Kraft v. Jacka*, 872 F.2d 862, 868 (9th Cir. 1989) *abrogated on other grounds by Dennis v. Higgins*, 498 U.S. 439, 442 n.2 (1991). On the other hand, if a statute gives the administering body broad authority to act with regard to the benefit, then the plaintiff is less likely to establish that he or she is entitled to that benefit. *Id*. Thus, the benefit is less likely to be a protected property interest. *Id*.

Plaintiffs argue that Washington law establishes a property interest in nondiscriminatory, non-arbitrary electricity rates. They claim that this property interest arises from language in RCW 54.24.080, which states that PUD rates must

be "fair" and "nondiscriminatory," and "from the requirement that Grant's Commission may not change those rates except at a properly-noticed public meeting with publicly recorded votes . . . ."  ECF No. 131 at 25 (quoting RCW 54.24.080).

It is not clear that a "fair" or "nondiscriminatory" rate can be considered property, or a property interest.  However, even if a "fair" or "nondiscriminatory" rate could be construed as a property interest, Washington law is clear: RCW 54.24.080 does not provide utility users and licensees with a private, enforceable right to fair and nondiscriminatory utility rates.  The State Supreme Court reached this conclusion in *Snohomish Cty. PUD No. 1 v. Broadview Television Co.*, 586 P.2d 851 (Wash. 1978).  There, the State Supreme Court explained that reading such a right into RCW 54.24.080 would "nullif[y] completely the grant of 'full and exclusive authority' to the district, making its rates subject to judicial review upon complaint of any user or licensee." *Id*. at 854.  The State Supreme Court confirmed the broad authority of public utility districts to set rates; such authority is not subject even to the review of the Washington Utilities and Transportation Committee. *Id*. at 855.

Assuming *arguendo* that a protectable property interest in the general concept of fair and nondiscriminatory rates can exist, Washington law does not create a legitimate claim of entitlement to such rates for users and licensees, for the

purposes of procedural due process.  As explained by the State Supreme Court,

Washington law gives wide latitude to public utility districts to set rates.

*Broadview Television Co.*, 586 P.2d at 854–55.  Moreover, the Court notes that

Washington law does not constrain public utility districts' discretion by providing

an approved method of rate calculation; in other words, the contours of the alleged

property interest are not defined clearly by state law.  Given the Commission's

broad discretion to set rates, and given the amorphous nature of a "fair" rate,

Plaintiffs have not demonstrated that they have a legitimate claim of entitlement to

a fair and nondiscriminatory rate under Washington law.  Thus, no protected

property interest exists to support Plaintiffs' procedural due process claim.

Because Plaintiffs cannot show that they were deprived of a protected property

interest, Plaintiffs' procedural due process claim fails as a matter of law.

### *Ratemaking as a Legislative Act*

Defendants also argue that setting rates is a legislative act, to which

procedural due process does not apply.  Thus, even if a property interest exists,

which the Court does not concede, Plaintiffs were not entitled to the protections of

procedural due process  in the setting of RS 17.

Procedural due process does not apply to legislative acts.  *Bi-Metallic Inv. Co.*

*v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915).  Therefore, before

procedural due process rights attach, a plaintiff must show that the deprivation

occurred as a result of an adjudicatory process rather than a legislative process. *See Harris v. Cty. of Riverside*, 904 F.2d 947, 501 (9th Cir. 1990). The parties dispute whether the adoption of RS 17, including Plaintiffs' placement in the Evolving Industries category, was a legislative act.

Plaintiffs argue that, because RS 17 applies to relatively few people, it should be characterized as an adjudicatory act, to which procedural due process rights apply. Plaintiffs find support for their argument in the case of *Londoner v. City & Cty. of Denver*, 210 U.S. 373, 385–86 (1908). In *Londoner*, a local board had to decide "whether, in what amount, and upon whom" a tax for paving a street should be levied. *Bi-Metallic Inv. Co.*, 239 U.S. 441, 445–6 (quoting *Londoner*, 210 U.S. at 385). Because only a few people were affected by the tax, and because each of them was affected "upon individual grounds," the Court found that the affected individuals had a due process right to a hearing before the tax was passed. Plaintiffs claim that, because RS 17 only has been applied to cryptocurrency mining companies, *Londoner* applies and requires certain procedural due process protections, such as notice and a hearing.

While there is merit to Plaintiffs' *Londoner* argument, Plaintiffs do not adequately respond to precedent that explicitly identifies rate setting as a legislative act, rather than an adjudicatory act. In *Prentis v. Atlantic Coast Line Co.*, a case involving train ticket rates, the Supreme Court explained why rate

setting is legislative in nature. 211 U.S. 210 (1908). In *Prentis*, a Virginia commission regulated the maximum rates that railway companies could charge their customers. *Id*. at 224. The commission was responsible for creating and enforcing those rates, and ensuring that they were "reasonable and just." *Id*. Prior to passing a new rate schedule, the commission held a hearing, during which it heard objections to the proposed rates. *Id*. After the hearing, the commission enacted a rate schedule, setting different rates for different railway companies. *Id*. at 225. Under the new rate regime, some railways were permitted to charge customers more than others. *Id*. Plaintiff railways challenged the new rates as confiscatory. *Id*. at 223.

The *Prentis* Court concluded that the commission's proceedings in adopting the new rate scheme were plainly legislative. *Id*. at 226. In doing so, it explained the difference between a judicial inquiry and a legislative act, stating:

> A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind . . . .

*Id*. The Court further announced that a legislative action cannot be recast as an adjudicatory action simply because the commission or other legislative body engaged in factfinding prior to reaching a decision. *Id*. at 227. As the Supreme

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 18

Court explained, "[m]ost legislation is preceded by hearings and investigations."

*Id*. Therefore, "it does not matter what inquiries may have been made as a preliminary to the legislative act." *Id*. The Supreme Court decided *Prentis* six months after deciding *Londoner* and still concluded that rate setting is legislative in nature.

Since *Prentis*, courts consistently have held that rate setting is a legislative act. *See e.g., Pub. Utils. Comm'n of State of Cal. v. United States*, 356 F.2d 236, 241–42 (9th Cir. 1966) (explaining that ratepayers have no constitutional right to participate in legislative procedures setting rates); *Earle M. Jorgensen Co. v. City of Seattle*, 665 P.2d 1328, 1331–32 (Wash. 1983) (confirming that rate setting is a legislative act, "even with respect to rate allocation and design").

Because rate setting is a legislative act, procedural due process rights do not attach. Therefore, even if Plaintiffs could point to a valid property interest, which the Court does not concede that they did, Plaintiffs' procedural due process claim fails as a matter of law.

**DORMANT COMMERCE CLAUSE CLAIM**

The Dormant Commerce Clause prohibits states and local governments from passing laws that burden interstate commerce. It ensures that producers and businesses in any given state have access to markets in other states by forbidding laws that effectuate economic protectionism. *See Hughs v. Alexandria Scrap*

*Corp.*, 426 U.S. 794, 808 (1976).  When a state or local law discriminates against interstate commerce on its face, the law almost certainly violates the Dormant Commerce Clause.  *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981) (citing *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).  When the challenged law is not facially discriminatory, it violates the Dormant Commerce Clause only if it places a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

The Supreme Court routinely has explained that the Dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127–28 (1978).  Similarly, the Dormant Commerce Clause does not protect a market's particular structure or method of operation.  *Id.*

Plaintiffs' Dormant Commerce Clause argument is difficult to follow.  First, the Court notes that the majority of the Plaintiffs in this matter are in-state companies conducting cryptocurrency mining operations in Grant County, Washington.  However, as two of the Plaintiff entities are not Washington State organizations, the Court will proceed to analyze Plaintiffs' claim.

RS 17 is not facially discriminatory, as it treats in-state and out-of-state cryptocurrency mining companies the same; all are classified as Evolving

Industries, and all are subject to heightened electricity rates due to the nature of their industry. The mere existence of the instant litigation, in which in-state and out-of-state Plaintiffs have brought the exact same claims, highlights the fact that the rate schedule is not facially discriminatory.

Therefore, the only question that remains is whether RS 17 places a burden on interstate commerce, and whether that burden is "clearly excessive in relation to the putative local benefits." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. at 471 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Plaintiffs' argument that higher electricity rates in Grant County burden interstate commerce is not supported. Essentially, Plaintiffs argue that higher electricity rates make their business less profitable, and, because they sell to consumers around the country, such rate increases inherently burden interstate commerce. Plaintiffs claim that, if other states or localities increase electricity rates similarly, they will be driven out of business. Plaintiffs argue: "If utilities outside Grant County adopted rate structures similar to Rate Schedule 17, interstate and international commerce using cryptocurrency and blockchain technology would be destroyed. Rate Schedule 17 therefore imposes undue burdens on interstate and international commerce" that violate the Dormant Commerce Clause. ECF No. 1 at 38.

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 21

Plaintiffs' argument does not support a Dormant Commerce Clause claim because it does not demonstrate a burden on interstate commerce. *See Exxon Corp.*, 437 U.S. at 125–28. The injustice that Plaintiffs perceive in this case is not that local laws will restrict the flow of goods across state lines, or that the higher rate will promote in-state cryptocurrency producers at the expense of out-of-state producers. Rather, Plaintiffs worry that other states and localities will see what Grant County has done and find that cryptocurrency miners should be required to pay a higher rate for electricity. Plaintiffs' arguments fail because the Dormant Commerce Clause does not protect an industry's profit margin, structure, or even its existence. *See id*. Rather, it ensures that states and local governments do not enact laws that protect in-state industry by burdening interstate commerce. Plaintiffs have shown no such burden here, and their Dormant Commerce Clause claim fails as a matter of law.

## FEDERAL POWER ACT CLAIM

Plaintiffs argue that Section 20 of the Federal Power Act prevents the District from charging unreasonable, discriminatory, and unjust electric rates. 16 U.S.C. § 813. Section 20 of the Federal Power Act states:

> When said power or any part thereof shall enter into interstate or foreign commerce the rates charged and the service rendered by any such licensee . . . shall be reasonable, nondiscriminatory, and just to the customer and all unreasonable discriminatory and unjust rates or services are prohibited and declared to be unlawful . . . .

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 22

*Id*.  Defendants have raised several arguments that they claim foreclose Plaintiffs'

Federal Power Act Claim, and the Court addresses each in turn.

## A.    Interstate Commerce

First, the District argues that Section 20 does not apply because the power in

question did not enter into interstate commerce.  Plaintiffs counter that Section 20

applies to the District because the District holds a federal hydroelectric license for

the Priest Rapids Project, and because electricity from that project enters interstate

commerce.  They argue that, once power enters any interstate grid, it immediately

becomes interstate power subject to the provisions of Section 20.  ECF No. 131 at

8–9 (citing *New York v. FERC*, 535 U.S. 1, 7 (2002)).

The Court is skeptical of Plaintiffs' argument.  The electricity in this case

was generated by a local dam and provided to county customers by a local public

utility district.  However, given the lack of briefing and clear guidance on this

point, the Court will assume, without finding, that the electricity is interstate, and

proceed with its analysis.

## B.    Retail Sales

The District also argues that Section 20 does not apply to retail sales.  In

*FERC v. Electric Power Supply Association*, the Supreme Court explained that the

FPA does not apply to retail sales.  136 S. Ct. 760, 768 (2016).  It declared, "The

FPA delegates responsibility to FERC to regulate the interstate wholesale market

for electricity—both wholesale rates and the panoply of rules and practices affecting them." *Id*. at 773. "That means that FERC has the authority—and, indeed, the duty—to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *Id*. at 774.

At first glance, the District's supporting case law seems to unequivocally foreclose Plaintiffs' argument. However, upon closer examination, it is apparent that all of the precedent supporting the District's argument, including the Supreme Court decision in *FERC v. Electric Power Association*, interprets Part II of the FPA, not Section 20, which is located in Part I. The interplay between Section 20 of the FPA and the relevant provisions of Part II of the FPA has not been sufficiently briefed or argued. Although the Court has found no cases applying Section 20 to retail sales, the Court is hesitant to issue a finding on this matter. As the Court's decision does not depend on this point, the Court will assume for the purposes of analysis, without finding, that Section 20 applies to retail sales.

### C. Plaintiffs' Cause of Action under Section 20 of the Federal Power Act

Defendants assert that Section 20 does not create a private cause of action that allows customers to challenge electricity rates. Numerous courts, under varying sets of facts, have held that the FPA does not create a general, private cause of action. *See e.g., City of Gainesville v. Fla. Power & Light Co.*, 488 F.

Supp. 1258, 1275 (S.D. Fl. 1980) ("[T]his Court concludes that there exists no private right of action of the nature sought by the plaintiffs under the Federal Power Act."); *Coalition for Competitive Electricity, Dynegy Inc., v. Zibelman*, 272 F. Sup. 3d 554, 565 (S.D.N.Y. 2017) (explaining that the omission of a general private cause of action in the FPA should be construed as intentional); *Village of Old Mill Creek v. Star*, No. 17 CV 1163 and No. 17 CV 1164, 2017 WL 3008289, at *8 (N.D. Ill. July 14, 2017) (finding that 16 U.S.C. § 824d, located in Part II of the FPA, requires "just and reasonable" rates, but that FERC must enforce those rates).

However, none of these cases addresses the specific statute in the FPA to which Plaintiffs point, Section 20, or 16 U.S.C. § 813. Therefore, the Court must analyze Section 20 to determine if it provides a private right of action to Plaintiffs.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The federal statute through which the plaintiff brings his or her claim must create both a private right and a private remedy. *Id*. Without both a private right and a private remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id*. at 286–87; *see also UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 699 (9th Cir. 2018).

### *Private Right*

When deciding if a private right exists, courts should examine the statute for "rights-creating language." *Sandoval*, 532 U.S. at 288–89. Rights-creating language focuses on the class of individuals protected by the statute, rather than the class of individuals or entities regulated by the statute. *Id*. The Ninth Circuit has declared that "the statute must place an unmistakable focus" on the class that the statute protects in order to create a private right of enforcement. *Mayer*, 895 F.3d at 699 (quoting *Ball v. Rodgers*, 492 F.3d 1094, 1106 (9th Cir. 2007)).

Section 20 requires that services provided and rates charged by licensees be "reasonable, nondiscriminatory, and just to the customer." 16 U.S.C. § 813. The statute declares "all unreasonable discriminatory and unjust rates [and] services . . . to be unlawful[.]" *Id*. Plaintiffs essentially argue that this language is rights-creating language. The Court disagrees with that assessment. Plaintiffs' analysis ignores the remainder of the statute, and the statute's context in Part I of the Federal Power Act, formerly the Federal Water Power Act.

Part I of the Federal Power Act, passed in 1920, establishes the Federal Power Commission (FERC's predecessor), and gives the agency authority to regulate certain water power projects. While Section 20 requires licensees to charge rates and offer services that are "just to the customer," the remainder of the statute is largely jurisdictional, providing FERC with enforcement authority in

some, limited circumstances. *See* 16 U.S.C. § 813. For instance, Section 20

explains that, if a state has established a commission to enforce the provisions of

Section 20, then FERC generally does not have jurisdiction to enforce those same

provisions.[1] After analyzing the statute, the Court does not find that the statute

places "an unmistakable focus" on the customer. *See Mayer*, 895 F.3d at 699

(quoting *Ball v. Rodgers*, 492 F.3d 1094, 1106 (9th Cir. 2007)). Rather, the statute

focuses on FERC's jurisdiction, power, and responsibilities.

### *Private Remedy*

Even if a private right could be found, which the Court does not concede,,

Plaintiffs have not established that a private remedy exists. "[T]o create a private

remedy, a statute must (at the very least) avoid remedy-foreclosing language."

*Mayer*, 895 F.3d at 699. If the statute provides for an express remedial scheme,

then the right to enforce the statute through a separate, private action likely is

foreclosed. *Id.* "That is because providing for 'one method of enforcing' a private

---

[1] The Court acknowledges that the Supreme Court has found that state regulation of interstate, wholesale power, as allowed by Section 20, violates the Commerce Clause. *See Public Utilities Comm'n of Rhode Island v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927). Thus, states do not have the authority to regulate in all instances contemplated by Section 20. However, for the purposes of this analysis, an at-length discussion of jurisdictional issues surrounding the FPA is unwarranted.

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 27

right 'suggests that Congress intended to preclude all others.'" *Id.* (quoting

*Sandoval*, 532 U.S. at 290).

Section 20 explicitly assigns either FERC or the states to enforce its

provisions. As the Court already has explained, Section 20 deals with

jurisdictional issues, delineating when FERC is empowered to enforce the statute

and when the states are empowered to enforce it. *See* 16 U.S.C. § 813. Moreover,

the statute contemplates that a "person aggrieved" may file a complaint with

FERC, under certain circumstances, to invoke FERC jurisdiction. *Id.* This express

language regarding enforcement suggests that Congress intended Section 20 to be

enforced through FERC procedures, or through state ratemaking procedures, rather

than through private, federal actions.

Plaintiffs argue that Section 20 provides them with a private remedy under

these facts. ECF No. 113 at 10. They claim that this remedy exists because

Section 20 includes the following language:

> The administration of the provisions of this section, so far as applicable,
> shall be according to the procedure and practice in fixing and regulating
> the rates, charges, and practices of railroad companies as provided in
> subtitle IV of Title 49 and the parties subject to such regulation shall have
> the same rights of hearing, defense, and review as said companies in such
> cases.

16 U.S.C. § 813.

Plaintiffs maintain that the above-quoted language entitles them to the rights of hearing and review listed in Subtitle IV of Title 49, which governs railroad regulation. However, the plain language of Section 20 only provides those "rights of hearing, defense, and review" to the "parties subject" to Section 20's regulation. The parties subject to Section 20's regulation are licensees, such as the District, not customers, such as the Plaintiffs.

Even assuming *arguendo* that customers are entitled to the remedies found in Subtitle IV of Title 49, it is apparent that none of those remedies applies here. As noted above, Section 20 cross-references Subtitle IV of Title 49, thus making the provisions of Subtitle IV of Title 49 relevant to Section 20, to the extent that they are "applicable." 16 U.S.C. § 813. One statute within Subtitle IV of Title 49 outlines the "[r]ights and remedies of persons injured by rail carriers." 49 U.S.C. § 11704. Plaintiffs assert that they are entitled to the same kinds of remedies listed in that statute, as Section 20 cross-references it. Under that statute, individuals are given the right to sue private rail companies in certain, limited circumstances. However, in each of those circumstances, the federal agency must have jurisdiction to enforce the relevant statute. *See* 49 U.S.C. § 11704(a). Here, the federal agency, FERC, does not have jurisdiction to enforce Section 20 against the District. *See Yakama Nation v. PUD No. 2 of Grant Cty. Wash.*, 103 FERC P 61073, 2003 WL 1889817, at **3 (2003). Upon review of Subtitle IV of Title 49,

the Court finds that none of the express methods of enforcement provided therein

is relevant to this case.

Congress has tasked enforcement of Section 20 to FERC and to the states, as

explained by Section 20's clear language. By providing for an express method of

enforcement, Congress intended to preclude stand-alone, private actions that

circumvent that method. *See Mayer*, 895 F.3d at 699. Because Section 20 does

not provide Plaintiffs with a private right or a private remedy, Plaintiffs have no

cause of action under that statute. Accordingly, Plaintiffs' claim under Section 20

of the Federal Power Act fails as a matter of law and is dismissed with prejudice.

**CLAIMS UNDER 42 U.S.C. §1983**

Plaintiffs allege Section 1983 claims against the Commissioners for the

alleged violations of their constitutional rights. "Traditionally, the requirements

for relief under [§] 1983 have been articulated as (1) a violation of rights protected

by the Constitution or created by a federal statute, (2) proximately caused (3) by

the conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*,

947 F.2d 1418, 1420 (9th Cir. 1991). As described in the preceding paragraphs,

the Court has concluded that Plaintiffs' constitutional and federal law claims fail as

a matter of law. Accordingly, Plaintiffs Section 1983 claims against the

Commissioners fail as a matter of law.

/ / /

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ~ 30

**STATE LAW CLAIMS**

A district court may assert supplemental jurisdiction over claims that "form part of the same case or controversy" over which a district court has original jurisdiction. 28 U.S.C. § 1367(a). However, if a district court dismisses all claims over which it has original jurisdiction, the court "may decline to exercise supplemental jurisdiction" over the remaining claims. 28 U.S.C. § 1367(c)(3). If all original jurisdiction claims are dismissed before trial, it is common practice to decline to exercise jurisdiction over any remaining state law claims. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) (Usually, "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").

The Court had original jurisdiction over Plaintiffs' federal claims under federal question jurisdiction. *See* 28 U.S.C. § 1331. However, now that the Court has granted summary judgment in favor of Defendants on those federal claims, there is no remaining basis for federal question jurisdiction. Furthermore, Plaintiffs have not alleged a basis for the Court to assert diversity jurisdiction over the remaining state law claims. Because the Court dismissed the claims over which it had an independent basis for subject matter jurisdiction, and because it did so early in the

litigation, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Acri*, 114 F.3d at 1001.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Renewed Motion for Summary Judgment, **ECF No. 106**, is **GRANTED IN PART**.

2. Plaintiffs' Motion for Summary Judgment, **ECF No. 124**, is **DENIED**.

3. Plaintiffs' federal claims are **DISMISSED WITH PREJUDICE.**

4. Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE.**

5. Judgment shall be entered for all Defendants on all federal claims.

6. Any remaining, pending motions, including the motions at **ECF Nos. 107, 108, and 112**, are **DENIED AS MOOT**, and any hearing dates are **STRICKEN**.

**IT IS SO ORDERED**. The District Court Clerk is directed to enter this Order, provide copies to counsel, and **close this case**.

**DATED** March 12, 2020.

*s/ Rosanna Malouf Peterson*
ROSANNA MALOUF PETERSON
United States District Judge

ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 32